434 So.2d 551 (1983)
STATE of Louisiana, State/Appellee,
v.
David R. HARRIMAN, Defendant/Appellant.
No. 15539-KW.
Court of Appeal of Louisiana, Second Circuit.
June 6, 1983.
Rehearing Denied August 3, 1983.
*552 Smith & Hingle by J. Randolph Smith, Monroe, for defendant/appellant.
Nancy F. Gilliland, Asst. Dist. Atty., Monroe, for state/appellee.
Before HALL, SEXTON and NORRIS, JJ.
SEXTON, Judge.
On March 18, 1983, the Louisiana Supreme Court, 429 So.2d 167, granted writs in this cause and remanded it to this Court "for briefs, argument and opinion." An identical writ application had previously been denied by this Court on January 6, 1983, No. 15,352-KW. We held therein that the showing made did not warrant the exercise of this Court's supervisory jurisdiction.
Having received briefs of counsel and heard oral argument, we find, for the reasons set out herein, that the judgment of the trial court on the motion to suppress at issue was correct. We therefore recall the writ, deny the relief requested, and affirm the judgment of the trial court.
The defendant is charged by indictment with First Degree Murder and Armed Robbery. His originally retained counsel filed a motion to suppress (a) all inculpatory statements, admissions and confessions, (b) certain physical evidence, and (c) the results of a post-arrest lineup. Subsequent to a hearing, the trial court overruled the motion to suppress.
In perfecting this application, the defendant asserts three assignments of error. First, the defendant contends that probable cause for his arrest did not exist. Secondly, the defendant contends that the court erred in failing to suppress inculpatory statements and/or confessions because (a) they were not freely and voluntarily given, (b) they were made following a request for an attorney, and (c) they were obtained by law enforcements personnel who had knowledge that the defendant was represented. The third and final assignment of error contends that the physical evidence was obtained *553 as a result of the defendant's unconstitutionally obtained statements, and is thus the fruit of a poisonous tree.
FACTS
On May 11, 1982, the attendant at the Racetrac Gasoline Station in West Monroe, Louisiana, was the victim of an armed robbery and homicide. The incident was reported by a person that had stopped at the station. This person told the police that at approximately 2:00 a.m., he saw a white male wearing a white shortsleeve shirt at the counter inside the station. He observed someone who he believed to be the attendant lying on the floor of the station. The witness reported that he saw the suspect enter a gold colored vehicle, leave the station, and travel south along the Thomas Road overpass over Interstate 20.
Several minutes after receiving this information, police officers from West Monroe arrived at the station. As Captain Fred Michael Davis of the West Monroe Police Department arrived at the station, he observed a man matching the description provided by the witness, exit the west side of the station, enter a gold Chevrolet, and leave the scene. The officer wrote down the license number of the car and the defendant was stopped shortly thereafter in this same vehicle.
The defendant was advised of his rights and informed that he was a suspect in this investigation. The defendant was transported to the West Monroe Police Department where a routine search was performed and $225 was taken from defendant's person. It was later learned that approximately $235 was missing from the station.
The defendant was taken to an interrogation room where he was formally placed under arrest for Armed Robbery and First Degree Murder and again advised of his rights. The defendant at this time executed a written waiver of his rights.
During interrogation thereafter, the defendant stated that he had stopped at the gas station for gasoline and had seen the attendant lying on the floor. He stated that he did not wish to get involved, and was in the process of leaving when he was observed by Captain Davis. When asked if he had been at the scene five minutes earlier, the defendant said that he had not. At this time, the defendant invoked his right to counsel, and the interrogation was terminated.
Shortly prior to noon, the defendant's original attorney, Paul Henry Kidd, contacted Captain Dale Smith of the West Monroe Police Department. This call was made subsequent to the defendant's invocation of his right to counsel. Captain Smith testified that Mr. Kidd advised him that he had been contacted but had not yet taken the case. On the motion to suppress, Mr. Kidd consistently implied in questioning witnesses that he had advised the officer that he was representing the defendant. Significantly, Mr. Kidd did not testify at the motion to suppress.
Shortly after 1:00 p.m., Corporal Via and Sergeant Fewell of the Ouachita Parish Sheriff's Department, on special assignment to the Ouachita Parish Homicide Task Force, had the defendant placed in an interview room to interrogate him about the unrelated homicides of three young women which the task force was investigating. Corporal Via had heard of the defendant's arrest on the radio that morning on the way from his home to court. Upon finishing in court and reporting to the task force office located in the same building as the West Monroe Police Department, he and Sergeant Fewell learned from their supervisor that no one had asked the defendant whether he had any knowledge of the homicides of the three females. Sergeant Fewell and Corporal Via had no details of the Racetrac filling station homicide, and were not investigating it. They were unaware that the defendant had invoked his right to counsel and they made no inquiry in that regard. Upon contacting the defendant, they advised him of his Miranda rights, which he waived. The officers conversed with the defendant about his general background, his education, his ability to read and write, and whether he was under the influence of alcohol or drugs. At this point, the defendant asked these officers why he had been *554 arrested. Via and Fewell informed him that they had little if any information about that subject, but that they understood it was because he had been seen in the vicinity of a recent homicide. They further told him that if he wanted more information it would be necessary to discuss it with the officers investigating that offense.
The defendant then stated that he wished to talk to the officers investigating the Racetrac case. Corporal Via, who was conducting the questioning, was not aware of who the investigator was. Sergeant Fewell asked the defendant if he knew the name of the investigating officer and then suggested that it might be Sergeant Norris of the West Monroe Police Department. Fewell then called Norris who was in the vicinity of the homicide scene searching for the murder weapon.
Sergeant Norris arrived shortly thereafter, and Corporal Via then re-read defendant's Miranda rights to him. Corporal Via specifically asked the defendant if he wished to talk to the officers without an attorney present and the defendant indicated his willingness to do so because he wanted "to cooperate" and did not want an attorney. Sergeant Norris, who had been present when the defendant originally invoked his right to counsel, and who was the only officer present who was aware of this invocation, made no inquiry of the defendant with respect to his previous invocation of counsel.
Corporal Via began the inquiry with respect to the Racetrac homicide by asking the defendant about the amount of money on his person at the time of his arrest. The defendant explained that he had recently been paid and detailed the amounts he had expended from that paycheck. Via advised him he had too much money on his person to be telling the truth. The defendant then said that he had obtained other funds by selling marijuana, stating the amounts he had sold and the price paid. Corporal Via then told the defendant that he did not have enough money if that was indeed what had occurred. The defendant became nervous and Via asked the defendant if he had killed the attendant. The defendant became very upset and indicated that if his psychiatrist were called to the station that the defendant would then explain what had happened to the attendant. Sergeant Norris left to make that call and was gone approximately 10 minutes. In Norris's absence, in the presence of Via and Fewell, the defendant stated that he had not intended to kill the attendant and that he had thrown the gun away. When Norris returned, the defendant was advising Corporal Via of the location of the homicide weapon.
The defendant testified at the motion to suppress that he did indeed ask Officers Via and Fewell why he was being held. He also testified that he wanted to talk to someone who knew something about the incident so that he might resolve the matter. He agrees that he specifically waived counsel with respect to the inquiry concerning the homicide of the three girls. He also testified that he wanted to get the matter over with because he "still had to go work." He further stated that after the arrival of Norris, Norris told him that it would be easier for him if he told the truth. He also testified that he did not remember being reread his rights after Norris arrived. The defendant further contended that he continued to request an attorney during this interrogation.
Sergeant Norris, in rebuttal testimony, stated that the defendant did not ask for an attorney at this interview until approximately an hour after it had begun. He testified that Corporal Via had left and that when he and Sergeant Fewell requested a recorded statement of the preceding interview, the defendant stated that he wanted to talk to an attorney before giving a recorded statement. Also in rebuttal testimony, Corporal Via testified that the defendant did not request an attorney in his presence.
While this interview was in progress, other officers searched the vicinity of the Racetrac filling station, the approaches to Interstate 20 and the Interstate itself for the *555 murder weapon. The officers knew from an autopsy of the victim earlier that morning that the victim had been shot with a large caliber weapon. Since the defendant had a .22 caliber pistol with him in the car at the time of his arrest, the officers conducted a search of the roadway shoulders and median in the general vicinity of the homicide in an attempt to locate a larger caliber pistol. As a result of the defendant's statements, the officers were able to concentrate their search on the area described by the defendant. During this process, it was learned that a worker engaged in mowing the Interstate in the area had, that same morning, found a .38 caliber 2-shot derringer in the median of Interstate 20 in the vicinity described by the defendant. Thus, the murder weapon was retrieved from the worker shortly thereafter.
ASSIGNMENT OF ERROR NO. 1PROBABLE CAUSE TO ARREST
In this initial assignment of error the defendant contends that probable cause for his arrest did not exist, and thus his confession and any other evidence stemming therefrom is the "fruit of a poisonous tree" and should therefore be suppressed. We find that there was probable cause for this defendant's arrest and hold that this assignment of error lacks merit.
Upon arriving at the murder scene, Captain Davis observed a man matching the description he had been given by the witness who first discovered the deceased. This man was observed entering a car which matched the description previously given the officer. It was obviously imperative that the officer stop this vehicle and make an inquiry. Upon being stopped, the defendant was visibly furtive. He was described by the officer as "continually fumbling." Captain Davis also stated that the defendant refused to raise his hands until the third occasion he was ordered to do so, and then only upon a threat of being shot. As Captain Davis ordered the defendant out of the vehicle, he observed a .22 magnum pistol on the floor of the car. He asked the defendant whether he had identification. The defendant told the officer his name but denied having any identification with him. However, Captain Davis noticed a billfold on the front seat of the car.
All of these circumstances, including the report of the witness, the observations of Captain Davis of the defendant at the gas station, the defendant's actions when stopped, and the finding of a weapon in defendant's car, constituted probable cause for this arrest. These facts, as viewed through the eyes of a veteran police officer, were sufficient to cause such an officer to reasonably believe this defendant had committed a crime. LSA-C.Cr.P. Art. 213. State v. Johnson, 363 So.2d 684 (La.1978); State v. Drew, 360 So.2d 500 (La.1978).
We note parenthetically that Captain Davis testified that he did not arrest the defendant at the time of the stop but told the defendant he was being transported to the station because he was under suspicion for the offense of murder. Captain Dale Smith testified that the defendant was formally placed under arrest at the station by Sergeant Norris, after it was learned that defendant had some $225 in his pocket, and that approximately $235 was missing from the Racetrac station. Irrespective of this testimony, it is clear that the defendant was in fact arrested after he was stopped by Captain Davis, handcuffed, placed in the back of Captain Davis's patrol car and taken to the police station. At that point, his liberty was restrained.
An arrest occurs when there is an extended restraint on one's liberty, rather than when an officer tells a suspect, "You are under arrest." LSA-C.Cr.P. Art. 201. State v. Bourgeois, 388 So.2d 359 (La.1980); State v. Tomasetti, 381 So.2d 420 (La.1980). The fact that the officers involved testified that this defendant was not under arrest until after his arrival at the station is inconsequential. What is crucial is that at the time the arrest actually occurred, the officer making the arrest had probable cause to do so. As we have held that Captain Davis had probable cause to arrest this defendant at the scene of the stop, his intent in this respect is immaterial.
This assignment of error lacks merit.
*556 ASSIGNMENT OF ERROR NO. 2RIGHT TO COUNSEL
In Assignment of Error No. 2 the defendant, relying on Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), contends that since he had requested counsel shortly after his initial interview with the officers investigating this homicide, any statement made thereafter is inadmissible as unconstitutionally obtained.
In Edwards the defendant was arrested pursuant to a warrant, brought to the police station, and advised of his rights. He indicated a willingness to submit to questioning and was then told that another suspect already in custody had implicated him in the crime at issue. The defendant denied involvement and gave a recorded statement asserting an alibi. He then sought to "make a deal," but the interrogating officer stated he did not have the authority to negotiate a deal and provided the defendant with the phone number of the prosecutor. After starting the call, the defendant hung up stating, "I want an attorney before making a deal." The questioning then ceased and he was taken to jail.
The next morning two colleagues of the officer who conducted the previous interrogation came to the jail to see the defendant. When the jailer informed Edwards that detectives wanted to speak to him, he stated he did not want to talk to anyone. He was told by the jailer that he "had to talk" and the defendant was taken to meet the detectives. After a Miranda warning and preliminary conversation, the defendant gave an oral confession but declined to implicate himself "on tape."
The United States Supreme Court, in holding the second statement inadmissible, stated:
"... we now hold that when an accused has invoked his right to have counsel present during custodial interrogation a valid waiver of that right cannot be established by showing only that he responded to further police initiated custodial interrogation even if he has been advised of his rights." Edwards, supra, 101 S.Ct. at 1884.
The Court went on to specifically state that after a defendant so situated as Edwards has expressed a desire that counsel be present in his communications with the police, the defendant is
"... not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police." Edwards, supra, 101 S.Ct. at 1885.
The concurrences by the Chief Justice, Justice Powell and Justice Rehnquist expressed concern that the above statement established a new rule with respect to judging a waiver of counsel by an accused in custody who has invoked this right. They also implied that any "new rule" was dicta, and that the existing standards for judging waivers were sufficient. Edwards v. Arizona, 101 S.Ct. 1880, 1886 (Burger, C.J., concurring); 101 S.Ct. 1880, 1887 (Powell, J., and Rehnquist, J., concurring).
However, given the clear statement of the majority opinion, we believe that our task here is to determine whether this defendant has indeed validly initiated the subsequent contact with police officers which led to his incriminating statements. The pronouncements of our own Supreme Court have been even more specific on the subject. Our Court anticipated Edwards in State v. Thucos, 390 So.2d 1281 (La.1980). Also applicable is State v. Arceneaux, 425 So.2d 740 (La.1983), in which our high court relied on Edwards to hold that a subsequent interrogation of an accused in custody by a second set of officers who were in good faith and unaware of the previous invocation of counsel, where the questioning involved the same offense, was improper.
The events which led to the incriminating statements in this cause began with the questioning of this defendant by Deputies Via and Fewell. These deputies were investigating entirely unrelated matters, were part of an entirely distinct agency than that which held the defendant in custody, and were unaware of his previous invocation of counsel. Therefore, our major *557 inquiry with respect to this assignment of error is whether these officers had the legal authority to question this defendant at all.
It is clear that the defendant voluntarily waived his right to counsel with respect to the matters being investigated by Deputies Via and Fewell. It is also clear that he initiated the conversation with these officers with respect to the Racetrac homicide. Both he and the deputies testified that he initially raised this issue by asking why he had been arrested. These officers did not know details of his arrest, however, and told him that they could not advise him in that respect. The defendant himself then specifically asked to speak to the officers investigating the offense for which he had been arrested. Deputies Via and Fewell were not even aware of who was investigating the offense, as is clear from the fact they asked the defendant if he knew. It was only after the arrival of Sergeant Norris, an officer investigating the Racetrac homicide, and after the defendant's clear waiver of his right to counsel, that he made the incriminating statements.[1]
It is therefore clear from these facts, and those more elaborately detailed in our statement of the facts, that the defendant himself initiated the inquiry to Officers Via and Fewell regarding the Racetrac homicide. He, himself, sought to resolve the matter with the officers actually investigating the homicide for which he was arrested.
The difficult task here is to determine whether Officers Via and Fewell could properly contact and question the defendant. Our holding herein is that where a defendant in custody has invoked counsel with respect to one offense, he may be questioned by officers of another agency on an unrelated matter when those officers are in good faith and unaware of his previous invocation of counsel. Thus any initiation of communication by the defendant to these officers concerning the offense for which he has previously invoked counsel is valid under the standards announced in Edwards.
We concede that Arceneaux, supra, may, at first glance appear contrary to this holding. Upon close analysis however, Arceneaux may be easily distinguished. In Arceneaux the defendant was questioned by officers not only of the same agency[2] as the officers to whom he had invoked counsel, but he was interrogated with respect to an offense for which he had specifically invoked his right to counsel. Thus Arceneaux is an extension of Edwards. It holds, simply, that once a defendant has invoked the right to counsel regarding an offense, he may not be questioned further regarding that same offense, even by officers in good faith and who may be unaware of his invocation of counsel, unless he himself initiates the communication. In the case at bar, Via and Fewell were not discussing the offense for which the defendant had been arrested, and indeed, they had made it clear to him that they had no interest in that case. Furthermore, he specifically waived his right to counsel with respect to the offenses which Via and Fewell were investigating.
The question presented here is more closely akin to that presented in State v. Willie, 410 So.2d 1019 (La.1982). The defendant was arrested in Arkansas and advised of his rights there by an FBI agent and an officer of the Arkansas State Police with respect to charges unrelated to the Louisiana offense for which he was later tried. Defendant invoked his right to counsel and the interrogation ceased. One week later, investigators from Washington and St. Tammany Parishes interviewed the defendant in the Arkansas jail regarding a *558 different offense for which he was later tried in Louisiana. He was fully advised of his constitutional rights and he waived the assistance of an attorney. The defendant then gave oral and recorded inculpatory statements.
Our Supreme Court asserted in Willie, in interpreting Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966):
"... the Miranda court indicated that improper interrogation by one law enforcement agency would not necessarily bar questioning about a different crime by a legally distinct authority." Willie, supra, at 1028.[3]
Thus our high court distinguished Edwards and held the confession at issue in Willie admissible.[4]
Our position herein is further supported by Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). In Mosley the defendant had been arrested for burglary and under questioning, after a Miranda waiver, the defendant indicated that he did not wish to discuss the matter. Later that same day, a homicide detective asked the defendant about a recent homicide. After being "carefully advised" of his Miranda rights, the defendant implicated himself in that offense. The United States Supreme Court held that questioning on an unrelated matter after the invocation of the right to silence by the same agency was proper, even though not initiated by the defendant.
We are unable to perceive a valid rationale for precluding good faith, non-oppressive questioning of an accused who has invoked counsel on an unrelated matter. Such interrogation furthers the public interest by attempting to determine the truth. Of course officers are required to warn defendants, as per Miranda, and the defendant who has invoked his right to counsel in the previous questioning regarding an unrelated offense, can certainly do so with respect to the subsequent inquiry.[5] Thus the defendant is adequately protected and the public interest is served. We perceive no prejudice where, as here, the officers are in good faith and the circumstances are not oppressive.
Therefore our reading of Edwards, Miranda, Mosley, Willie and Arceneaux compels us to hold that officers who are in good faith, and unaware of the defendant's previous invocation of counsel on an unrelated matter, may legally inquire of the defendant as to a different matter. If during this interrogation the defendant initiates an inquiry or conversation concerning the matter for which he earlier invoked counsel, the standards of Edwards, Thucos and Arceneaux are met and any statements resulting therefrom are admissible.
In addition to the principal issue in this assignment discussed above, the defendant contends that any statements rendered by *559 him were not freely and voluntarily given, and that the officers questioned defendant without the presence of counsel after being advised that he was represented.
We are well satisfied that the defendant's statements were freely and voluntarily given. The record shows that the defendant was repeatedly advised of his Miranda rights and there are no allegations of mistreatment. As to the allegation that the defendant was interviewed without the presence of counsel after officers knew the defendant had an attorney, the only evidence in the record in this respect is the testimony of Captain Dale Smith. Captain Smith testified that attorney Paul Henry Kidd called him shortly before noon on the date of the defendant's arrest to say that he might represent the defendant, but that he was not yet retained. The record establishes that the defendant was not represented by counsel when questioned by Deputies Via and Fewell.
This assignment of error lacks merit.
ASSIGNMENT OF ERROR NO. 3SEIZURE OF THE DERRINGER
In this assignment of error the defendant contends, relying on the "fruit of the poisonous tree" doctrine of Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), that the derringer, and the shell casing and the bullet found therein should be suppressed. The defense asserts that, absent the allegedly tainted confession, the state would never have been able to locate this weapon and the items contained therein. It is the defense's position that the weapon located by the member of the mowing crew would not have been discovered absent the statement because the officers would not have searched Interstate 20 until after the crew had left the area. Thus the weapon would have gone home with the finder, never to surface again.
We have held that the inculpatory statements are admissible. However, assuming arguendo the inadmissibility of the statements, we are of the view that the officers would have located the weapon nevertheless, and it is therefore admissible.
The defense's position is highly speculative. We agree with the state that the record indicates that the officers would have searched this area on their own sometime during the day. Even if the mowing crews had moved on, the fact that the area had recently been mowed was obvious. It seems most likely the officers would have soon inquired of the mowing crew. Furthermore, even if the officers had not discovered the existence of the mowing crew, we believe it more likely than not that the state worker would have recognized the significance of the weapon and turned it in.
The existence of this weapon was known to the police independently from the statements of the defendant. Furthermore, it appears that it was quite likely that the weapon would have been found without the defendant's directions. Therefore the rule of Wong Sun, supra, is inapplicable. State v. Marshall, 359 So.2d 78 (La.1978); U.S. v. Crews, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980). In particular see note 12 in Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, at page 1243, 51 L.Ed.2d 424 (1977).
This assignment of error lacks merit.
For the reasons assigned, the judgment of the trial court overruling the motion to suppress is affirmed, and the writ and stay order issued herein are both recalled.
AFFIRMED.
NOTES
[1] Deputy Via was conducting the questioning. He asked the defendant about the sum of money on his person at arrest, which approximated the amount reported missing from the station, when the defendant became very nervous. He then broke down when Via asked him directly if he had killed the attendant. This interrogation cannot be described as grueling, hard-hitting or even lengthy. In fact Norris was not even present when the defendant made his initial and most incriminating statement because he had gone to contact the defendant's psychiatrist, at the defendant's request.
[2] These officers were concededly in good faith and unaware of the defendant's previous invocation of his right to counsel.
[3] It should be noted that in Miranda the Court also said:

"We do not suggest that law enforcement authorities are precluded from questioning any individual who has been held for a period of time by other authorities and interrogated by them without appropriate warnings. A different case would be presented if an accused were taken into custody by the second authority, removed both in time and place from his original surroundings, and then adequately advised of his rights and given an opportunity to exercise them." Miranda, supra, 86 S.Ct. at 1639.
[4] The recited facts in Willie are a bit confusing. At page 1026 of the opinion, the statement is made that the FBI agent who originally questioned the defendant received a call on June 11th from one of Willie's jailers informing him that two days earlier, on June 9th Willie had requested to speak to the FBI agent. The statement of facts goes on to note that on June 10th, the Louisiana officers interviewed the defendant and fully advised him. At page 1029, the opinion states "he [Willie] himself initiated further communication with both federal and state law enforcement officials." Thus, the broad statement at page 1029, does not necessarily follow from the facts related at page 1026.
[5] Indeed, it seems the state's biggest problem in Edwards was that the defendant when recontacted told the jailer he did not want to talk. Thus, the concurrences therein, as previously noted, are correct that the "initiation" requirement of Edwards is unnecessary to the result and may be dicta. But, our high court rendered Thucos and Arceneaux which are consistent with the language of the majority opinion of Edwards and must also be followed.