469 So.2d 346 (1985)
STATE of Louisiana, Appellee,
v.
Michael HUSSEY, Charles A. Dawson, Appellants.
No. 16956-KA.
Court of Appeal of Louisiana, Second Circuit.
May 8, 1985.
Rehearing Denied June 7, 1985.
*347 Tucker, Jeter & Jackson by Kenneth L. Hickman, Shreveport, for appellant Michael Hussey.
Richard E. Hiller, Indigent Defender Office, Shreveport, for appellant Charles Dawson.
William J. Guste, Jr., Atty. Gen., Baton Rouge, Paul J. Carmouche, Dist. Atty., Powell A. Layton, Tommy J. Johnson, Asst. Dist. Attys., Shreveport, for appellee.
Before MARVIN, SEXTON and NORRIS, JJ.
MARVIN, Judge.
After pleading guilty to simple burglary and being sentenced, defendants perfected this Crosby appeal[1] to question whether a taped recording and the alleged "poisonous fruit" of their inculpatory conversation in the rear seat of a state police car should have been suppressed on the pre-trial motion of defendants. CCrP Art. 703.
Defendants contend that their conversation was electronically intercepted and taped by a recorder hidden intentionally by the state policeman, contrary to LRS 15:1303(A)(1), because they had a reasonable and justifiable expectation that their conversation was private. LRS 15:1302(10); LSA-Const. Art. 1, § 5. See *348 Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).
We find no error and affirm the trial court's denial of the motion to suppress.

FACTS
In a borrowed pickup belonging to Ricky Foster, defendants drove to the home of an acquaintance, William Sanders, in Shreveport about 7:00 p.m. on January 1, 1984. There they forced entry and stole and loaded several musical and electronic instruments such as guitars, amplifier, and speakers into Foster's truck.
When defendants returned to Ricky Foster's home in Bossier Parish, he insisted that the stolen items be returned to the home of Sanders, who was also his acquaintance. With this intention, Foster then proceeded to drive his truck, with defendants as passengers, onto Interstate Highway 20 a few miles east of Bossier City. The three had been drinking on that New Year's Day.
State Trooper Porter was patrolling the area of that interstate. He noticed what he described as the slow and erratic manner in which the truck was being driven and caused Ricky Foster to stop and exit the truck. After observing Foster and conducting field sobriety tests, Trooper Porter arrested him for DWI about 7:50 p.m., handcuffed him, and confined him in the back seat of the police car. By this time the two defendants were out of the truck and Trooper Porter noticed that they had been drinking but did not arrest them.
Trooper Porter testified that it is State Police policy not to allow a vehicle or pedestrians to remain on the interstate right of way and not to allow anyone who has been drinking to drive a vehicle away in such circumstances. Trooper Porter asked defendants to give him the name of someone nearby so he might contact someone to come and get them and the truck. Porter called a wrecker for the truck and told defendants he would take them to Troop G State Police Headquarters from where they could catch a ride or await his return from the Bossier Parish jail after he booked Ricky Foster for DWI.
After recognizing that the contents of the truck were valuable, Trooper Porter asked Ricky Foster whether he wanted the truck contents inventoried for the purpose of making the State Police and wrecker driver responsible for the contents. Foster requested or asked that the contents be inventoried. The two defendants were then instructed or asked to stay with Foster in the back seat of the police car. Trooper Porter's inventory is contained in the record.
While Porter conducted the inventory and awaited the wrecker, defendants and Foster [re]engaged in the conversation about the items stolen in the burglary and their obvious predicament. They did not know that their conversation was being recorded by a tape recorder the trooper had hidden in the front seat.[2]
At 8:48 p.m., approximately one hour after the truck was stopped, and shortly after Porter reached Troop G State Police Headquarters with his passengers, the testing device at the headquarters was activated for the purpose of testing Ricky Foster's blood alcohol content. Defendants then eventually succeeded in getting someone to drive them home apparently while Foster was tested. Foster's test was conducted at 9:15 p.m. and he was then taken *349 by Porter to the Bossier Parish jail in Benton about ten miles away. After Foster was booked and incarcerated, Porter stopped his car on the highway south of Benton to converse with another trooper. During this conversation, Porter was asked about the tape recorder in his car. Porter played the tape and learned that the items he had inventoried in the Ricky Foster arrest had been stolen in Shreveport. Porter then instructed the wrecker service to impound and hold the truck and its contents for the police.
On January 2, 1984, either before or after daylight (the record is not definite), Porter telephoned the Shreveport Police to report what he had learned and where the stolen merchandise was being held at his order. Porter testified that he "thought" or "felt" that the items he described to Shreveport police had not been reported to them as being stolen before his telephone call. The record does not support Porter's conclusion, however, as we shall demonstrate.
Sanders, the homeowner, was told about the burglary about 8:00 p.m. January 1, 1984, by one or more neighbors who had seen defendants ("white men in a tan pickup") at Sanders' house loading the items into the pickup. Sanders said he immediately telephoned the Shreveport police and reported this after he learned it. Sanders gave a recorded statement to a Shreveport detective on January 2, 1984, which is edited and reproduced:
SANDERS: Jessie Wheeler had been over to my house, around 5:00 p.m., I believe and I'm living with my parents because my gas line is broke and that's the main reason they broke in because they knew no one was there, and he arrived at our house at about 7:00 or 8:00 Sunday night [January 1, 1984] and we ran back over and then we called the police. And then the next thing, Charles Dawson [defendant] had started calling up asking for my brother and he finally got ahold of him and told him to come over to his trailer because they had the stuff there.... He said that they had chased some black men off who were trying to haul it off and they had ran them down and they had had a wreck and they had took the stolen items from them and they claimed that they were fixing to bring them back to me, and then, that's when they started calling my brother up and telling him that they wanted him to come over and pick the stuff up.
DET.: OK, you indicate the suspect as making the phone calls as CHARLES DAWSON and of course you indicate they. Who are you talking about other than CHARLES DAWSON? Who was with them that saw these people?
SANDERS: Well, I heard that it was, ah, a guy by the name of MIKE HUSSEY and that's about all.
DET.: OK, does the name RICKY FOSTER ring a bell with you?
SANDERS: Sure does.
DET.: Can you give me his part or did you hear of possibly FOSTER being with HUSSEY and DAWSON?
SANDERS: I understand that they were together, that they did it all together.
DET.: OK, and what's your brother's name?
SANDERS: William Sanders ... He lives at 413 Indian Trail in Shreveport....
DET.: How did they enter your residence on ... January 1st?
SANDERS: It appears that they had broke through a window in the side of the house and then opened the front door and started shoving the stuff in. The neighbors say that they were in a tan truck.
DET.: OK. Do you know the name of that neighbor?
SANDERS: Jan is her first name, I'm not sure bout her last. She lives right next door at 2935 Quinton.
DET.: OK, did Jan advise you whether or not they were white or black people in this tan truck?

*350 SANDERS: ... I believe she said that they were white ... She said she saw them taking everything away.
Bracketed information and emphasis supplied.
We emphasize that Sanders made the recorded statement at 7:05 p.m. on Monday, January 2, 1984, and squarely stated that he had telephoned police about 8 p.m. the night before to report the details of the burglary.
Two days later a Shreveport detective caused an arrest warrant to issue for the defendants.[3]
After being arrested and given Miranda warnings, each defendant made an inculpatory statement to Shreveport police admitting, in most part, their participation in the Sanders burglary.

THE LAW AND TRIAL COURT'S RULING
The trial court held that defendants did not have a reasonable expectation of privacy while in the rear seat of the police car and denied defendants' motion to suppress. There is support for the trial court's ruling. See and compare State v. Reeves, 427 So.2d 403 (La.1982); State v. Ragsdale, 381 So.2d 492 (La.1980); Rios v. U.S., 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960); U.S. v. Harrelson, 754 F.2d 1153 (CA5 1985); Lanza v. New York, 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962); U.S. v. Hearst, 563 F.2d 1331 (CA9 1977), cert. den. 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90.
Harrelson squarely held that an electronically intercepted conversation between an incarcerated prisoner and his visiting wife by a hidden and disguised tape recorder was admissible because the expectation of privacy in such a situation could not be found reasonable. The federal electronic eavesdropping statute (18 U.S.C. §§ 2510-20), after which our statute (LRS 15:1301 et seq.) is patterned, was there interpreted.[4]
Harrelson noted that Lanza, cited supra, observed that a jail does not share the attributes of privacy recognized as reasonably expected elsewhere and that surveillance (eavesdropping in Harrelson) in prison is "traditional." Compare Katz (a public telephone booth) and Rios (a public taxicab), cited supra.
*351 At this juncture we note that Trooper Porter explained that defendants would have been free to walk away had the truck been stopped on a highway other than the interstate where there was access to stores and houses with telephones, but that State Police policy did not permit a trooper to allow passengers to be left on the interstate, especially those who had been drinking. We also emphasize that when Trooper Porter told or asked the two defendants to get into the rear seat of his police car, Ricky Foster had been arrested and was confined there. Thus, whether defendants were mere invited guests or visitors or were under some limited custody of the trooper, it should have been obvious to them that they were in the closed rear seat area in which Foster, their friend and late chauffeur, was handcuffed and confined under arrest for DWI. Under these circumstances their expectation of privacy would not have been recognized as reasonable and justifiable under Harrelson`s interpretation of the federal statute. We see no reason, or substantial difference in the statutes, state and federal, which compels us to conclude the motion to suppress should have been granted. See footnote 4. LSA-Const. Art. 1, § 5, protects against unreasonable invasions of privacy, as does the Fourth Amendment. In this limited respect, we also see no reason why the constitutional provisions should be interpreted differently. See State v. Coleman, 469 So.2d 1069 (La.App. 2d Cir.1985).
Moreover, the recorded statement by the victim, Sanders, to the Shreveport police that was given on January 2, 1984, informed the police that defendant Charles Dawson had told Sanders' brother that Ricky Foster, and the defendants, Dawson and Mike Hussey had recovered the items that Dawson said had been stolen from Sanders' home by "some black men" and that Sanders' brother should come get the items from defendants and Foster. Sanders gave this statement two days before the arrest warrant issued for defendants. This statement also informed police that a neighbor had seen white men loading the items in a tan truck on the night of January 1, 1984. Defendants and Foster are white men. Sanders told police about the burglary about an hour after it occurred on January 1, 1984.
The Shreveport police then had information independent of the tape complained of that connected the two defendants and Ricky Foster to the items stolen from Sanders' home and to Ricky Foster's tan truck. This information was sufficient to lead to police inquiries as to the whereabouts of the truck and the stolen items and to lead to the inevitable arrest of the two defendants.
Even should we agree that the tape of the police car conversation should be suppressed, it would not avail defendants.
In the language of the "time worn" metaphor of the Wong Sun poisonous tree, the assumed toxic tape was injected only after the evidentiary bud had blossomed because of information relayed to the police by Sanders that was in part before the tape, and, even afterward, independent of the tape. The fruit of that blossom (resulting from proper custodial interrogation of defendants that produced confessions and the whereabouts of the truck) was not tainted or poisoned. U.S. v. Crews, 445 U.S. 463, 472, 100 S.Ct. 1244, 1250, 63 L.Ed.2d 537 (1980), citing Harrison v. U.S., 392 U.S. 219, 222, 88 S.Ct. 2008, 2010, 20 L.Ed.2d 1047 (1968). See State v. Harriman, 434 So.2d 551 (La.App. 2d Cir.1983), writ denied.
Similarly, it would not avail defendants for us to assume their arrest was unlawful. Defendants' motion is directed primarily at the tape of their conversation in the police car. Defendants would have us suppress the tape to allow them to move to withdraw their guilty plea and thereafter move to suppress other evidence allegedly that derived directly from the suppressed tape and the illegal arrest. An illegal arrest is not of itself a bar to a later prosecution or a defense to an otherwise valid conviction. The exclusionary principle of Wong Sun limits what proof the government may use at trial, but a defendant himself is not a suppressible fruit and the illegality of his detention cannot deprive the government of the opportunity to *352 prove his guilt by evidence untainted by police misconduct. U.S. v. Crews, supra, 445 U.S. at 474, 100 S.Ct. at 1251. In short, defendants could have been convicted without the taped police car conversation being used at their trial and by evidence untainted by the alleged toxic tape.
Sanders, the homeowner victim, and his brother could testify about what they knew against defendants. Sanders' neighbor could testify about what she saw. Trooper Porter could testify about his stop and inventory of the truck and the presence of defendants. Ricky Foster could testify about his earlier conversation and his police car conversation with defendants and about his expressed intention to return the stolen items to Sanders.
As in Harrelson, our holding should not be construed as giving blanket approval to the clandestine taping by the State Trooper. See footnote 2. Under the circumstances of this record, however, we find no error in the trial court's ruling denying the motion to suppress the tape and we affirm the ruling and the conviction of each defendant.
AFFIRMED.
NORRIS, J., concurs in the result.
NOTES
[1] State v. Crosby, 338 So.2d 584 (La.1976).
[2] Trooper Porter said that he arrests dozens of people for DWI, some of whom go to trial many months later. He explained that he had used the hidden tape recorder to refresh his memory in such cases and, in other cases, to protect himself against unfounded allegations made in civil actions against him by people he arrests.

We recognize, parenthetically, the apparent dilemma of a lone patrolling officer under such circumstances. As discussed infra, however, we cannot approve or encourage the clandestine taping of every conversation under every imaginable circumstance in the police car and not in the presence of the officer. Under some circumstances, the conviction of a defendant solely on the basis of evidence directly derived from such an illegal and unconstitutional recording would not stand judicial scrutiny under Wong Sun.
[3] "Affiant is a detective with the Shreveport Police Department. Through personal investigation, affiant has learned the following: Complainant in this case is Harold W. Sanders, residing at 2931 Quinton, Shreveport, Caddo Parish, Louisiana. On the night of January 1, 1984, his residence was burglarized. Items taken included several musical instruments and amplifiers, including two Zenith speakers, a 500 watt Yamaha amplifier, a Sony AM/FM turntable stereo system, an electric piano, and three electric guitars.

"On January 2, 1984, Trooper Richard Porter of the Louisiana State Police Troop G, contacted affiant and stated that on the night of the offense Porter had stopped a 1979 Chevrolet pick-up truck being driven near Louisiana Downs for Driving While Intoxicated, and the driver was Rickey D. Foster. Foster was subsequently arrested for Driving While Intoxicated. Two other white males were in the vehicle with Foster, named Michael Hussey and Charles A Dawson. These individuals were not arrested by Trooper Porter at this time. The vehicle was impounded by Porter in Bossier City. Foster subsequently bonded out of jail on the DWI charge. The pick-up truck contained several musical instruments and the other items. Affiant, Porter, and the complainant went to the vehicle which was still impounded, and the complainant identified the items as being his, which had been reported stolen from his residence burglary. The complainant stated that all the items had been inside his residence when the offense occurred, and that all the items belonged to him. Trooper Porter further stated that a tape recorder which was in his vehicle had been running, and when he switched it on upon his return to the station, he heard the tape, and all three suspects were discussing the above offense and the items in the back of Foster's pick-up truck and their involvement with the burglary."
[4] The pertinent definitional subsection of each statute is identical in questioning whether the expectation of privacy may be deemed justified [or reasonable]:

"(2) `oral communication' means any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation;" 18 U.S.C. § 2510(2)
"(10) `Oral communication' means any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." LRS 15:1302(10)