**STATE of Minnesota, Appellant,**

v.

**Aron Nahum EDROZO, Respondent.**

No. C4–96–2591.

Supreme Court of Minnesota.

May 14, 1998.

Hubert H. Humphrey, III, Minnesota Attorney General, Richard M. Arney, Washington County Attorney by Michael C. Hutchinson, Assistant County Attorney, Stillwater, for appellant.

Michael H. Daub, Minneapolis, for respondent.

Paul R. Scoggin, Assistant Hennepin County Attorney, Mary M. Lynch, Staff Attorney, Minneapolis, for amicus curiae Minnesota County Attorney's Association.

## OPINION

GARDEBRING, Justice.

This pretrial appeal requires us to determine whether incriminating statements, which were made by a suspect to a companion while both were seated in the rear seat of a marked police car and which were secretly tape recorded, are admissible in a criminal trial for second-degree assault with a dangerous weapon. In addition, we are asked to determine whether unrecorded voluntary statements made by the suspect away from a place of detention are admissible. Because we hold that the lower court decisions suppressing the statements were clearly erroneous, we reverse.

On the evening of July 25, 1996, two officers of the Stillwater Police Department responded to a call from a Stillwater health care facility, reporting vehicles drag racing in the area of Third Street and Linden Street. Officer Bradley Allen drove to the area and was met by a group of five young men, who reported that their vehicle had been struck from behind by a Chevrolet S–10 Blazer, driven by the appellant, Aron Edrozo. The five men complained that Edrozo was armed and had threatened them and that he had driven onto the curb and sidewalk numerous times, attempting to run them over with his vehicle. The officer observed minor damage to the rear end of the alleged victims' vehicle. While Officer Allen was interviewing the young men, they reported seeing the S–10 Blazer driving eastbound about one block away. The officer radioed for backup and pursued and stopped the vehicle.

The officer found several young men in the vehicle, including Edrozo, who was a passenger at the time of the stop. Pointing his shotgun at the vehicle, the officer ordered all the occupants to raise their hands and ordered the driver out of the vehicle and onto the ground. He then placed handcuffs on the driver and placed him in the rear of his squad car. When additional police officers arrived on the scene, the other passengers were removed from the vehicle. Two of the victims were brought to the scene and identified Edrozo as the driver who tried to run them down. They also told the officer that the site of the stop was the actual location of the rear-end collision. The investigating officer inspected the scene and found physical evidence of a collision: a piece of white plastic lens and parts of a license plate frame, which matched damage to the vehicles.

During this investigation, Edrozo was placed in the back seat of Officer Allen's marked police car. Along with Benjamin Easton,[1] a companion from the S–10 Blazer, Edrozo was subsequently transferred to the back seat of a second squad car, which had been driven to the scene by Officer C.T. Felsch. Officer Felsch's squad car contained a hidden tape recorder, which he activated after placing the suspects in his vehicle. Officer Felsch initially questioned Edrozo about the evening's events and was told by Edrozo that he had been driving his car when the complainants started chasing him in their vehicle. Officer Felsch then left the squad car, leaving Edrozo and his companion alone. The hidden tape recorder secretly logged the

---

1. Easton was detained after police discovered drug paraphernalia on his person.

conversation between Edrozo and his companion, which included threats against the alleged victims and a statement that the police would not find any evidence that the Blazer had been involved in a collision.[2] At this time neither Easton nor Edrozo had been formally arrested or read his Miranda rights.

At some point later in the investigation, Officer Allen entered the squad car and read Edrozo his rights. Edrozo agreed to discuss the incident and denied any wrongdoing, telling the officer that he was being "set up." Edrozo was taken to the Stillwater police station, where he was charged with five counts of second-degree assault in violation of Minn.Stat. § 609.222 (1996), one count of leaving the scene of an accident in violation of Minn.Stat. § 169.09, subd. 2 (1996), and one count of minor consumption of alcohol in violation of Minn.Stat. § 340A.503, subd. 1 (1996). At the station, Edrozo refused to speak outside of the presence of counsel and the interview was terminated. Edrozo was released on bond pending appearance.

Four days later, on July 29, 1996, Edrozo and his mother went to the Stillwater police station to retrieve some personal belongings from the S–10 Blazer, which was being held at the Stillwater impound lot. Investigator Davin Miller of the Stillwater police department accompanied the pair to the impound lot, which was a short distance away from the police station. While at the impound lot, Edrozo began to question Miller about the investigation. Since Edrozo had previously invoked his right to counsel, Miller did not question him, but reminded Edrozo that he could not talk to him about the case. Despite this, Edrozo made numerous unsolicited and voluntary statements including, *inter alia*, that Edrozo had accidentally rear-ended the other vehicle involved, that he had left

the scene of the accident because he was frightened, and that he had intentionally tried to run over two (not five) of the victims after they brandished a weapon at him. The statements were not recorded, and Miller did not repeat the Miranda warning at that time.

At the omnibus hearing, Edrozo moved to suppress both the secretly recorded conversation in the police car and the July 29 statements made to Investigator Miller. The trial court suppressed the tape of the secretly recorded conversation on the grounds that it was unfairly obtained and violated Edrozo's right not to incriminate himself. In particular, the trial court concluded that the sole motive for the transfer of Edrozo and Easton to the second patrol car was to obtain incriminating statements without providing Edrozo with a Miranda warning. The court also suppressed the July 29 statements, citing "all the facts and circumstances, and the *Scales* decision."[3] The court of appeals affirmed the trial court order, concluding that the tape recorded conversation should be excluded under *Miranda*, and that the state had failed to show that the suppression of the statements made at the impound lot would have a critical impact on the prosecution of the defendant. We reverse.

## I. Critical impact

■ In a pretrial appeal of an order suppressing evidence in a criminal case, we will reverse the determination of the trial court only "if the state demonstrates clearly and unequivocally that the trial court has erred in its judgment and that, unless reversed, the error will have a critical impact on the outcome of the trial." *State v. Webber*, 262 N.W.2d 157, 159 (Minn.1977). With respect to Edrozo's July 29 statements, the court of appeals held that the state had not met the burden of showing critical impact, and declined to reach the merits of the issue.[4]

2. The tape has not been entered into evidence and is not in the record. According to the supplemental report of Officer Felsch, the two suspects talked on tape for approximately 30 minutes. The prosecutor and defense counsel listened to the tape together and argued its admissibility at the omnibus hearing. The trial court judge did not listen to the tape.

3. *State v. Scales*, 518 N.W.2d 587 (Minn.1994). In *Scales*, this court, in the exercise of its supervisory power and in the interests of justice, held

that all custodial interrogation "shall be electronically recorded where feasible and must be recorded when questioning occurs at a place of detention." *Id.* at 592. Any statements obtained by the police in violation of the *Scales* recording requirement will be suppressed if the violation is deemed "substantial." *Id.* The trial court made no findings as to substantiality, as required by *Scales*.

4. The court of appeals apparently assumed that the tape-recorded statements met the critical im-

*State v. Edrozo,* 567 N.W.2d 59, 62 (Minn. App.1997). We must, therefore, begin by discussing this threshold issue.

■■■ Whether suppression of a particular piece of evidence will have a critical impact depends on the nature of the state's evidence against the defendant. *State v. Zanter,* 535 N.W.2d 624, 630 (Minn.1995). It is "necessarily a demanding standard." *Id.* Nevertheless, the critical impact rule does not require that the suppression order render the available proof insufficient as a matter of law, or so weak as to effectively destroy a successful prosecution.[5] *State v. Joon Kyu Kim,* 398 N.W.2d 544, 550–51 (Minn.1987). As this court has clarified in prior cases, the standard for critical impact is that "the lack of the suppressed evidence significantly reduces the likelihood of a successful prosecution." *Id.* at 551.

■■ In the present case, the state has five eyewitnesses who allege that Edrozo attempted to run them down, photographs of a single tire mark on the grass and curb at the location of the attempt, and physical evidence of a collision, gathered at the scene of the hit-and-run. The defendant's statement at the impound lot, however, allegedly includes an admission that he intentionally tried to hit two of the victims as they stood on the sidewalk.

Assault is a specific intent crime. The prosecutor must prove beyond a reasonable doubt that the defendant either (1) acted with intent to cause fear in another of immediate bodily harm or death; or (2) intentionally inflicted or attempted to inflict bodily harm on another. Minn.Stat. § 609.02, subd. 10 (1996); *State v. Cole,* 542 N.W.2d 43, 51 (Minn.1996). The defendant's own words are directly relevant and highly probative of his state of mind on July 25, 1996. Even if the state's case is as strong as the court of appeals believes, it is clear that the defendant's confession is important to the state's burden of proving defendant's state of mind. We believe that suppression of the July 29 statements would significantly reduce the likelihood of a successful prosecution, and therefore we hold that the state has shown that the court's order will have a critical impact on the case.

## II. The tape-recorded statements

Having determined that the trial court's suppression orders meet the critical impact standard laid out in our cases, we next turn to the second prong of *Webber,* and determine whether the trial court erred in suppressing the statements. *Webber,* 262 N.W.2d at 159. The trial court suppressed the tape of the secretly recorded conversation made in Officer Felsch's patrol car, concluding that "[t]he tactic of Officer Flesch [sic] leaving his tape recorder on while Easton and Edrozo were in the rear of his squad car was a method to obtain incriminating evidence against Edrozo without providing him with the *Miranda* warning." Both the trial court and the court of appeals determined that the tape recorded statements violated Edrozo's Fifth Amendment rights.[6]

---

pact test, and did not address the issue with respect to the suppression of the tape recording. The parties do not raise the issue before this court and, accordingly, we decline to address it.

5. This was the prior standard under Minn.Stat. § 632.12 (1967) (repealed 1979).

6. Neither court below analyzed whether Edrozo's Fourth Amendment rights were violated by the surreptitious tape recording of his conversation, and the parties did not raise the issue to this court. Therefore, we decline to decide it. As noted in the concurrence, at least one commentator has suggested that surreptitious taping of the kind at issue here constitutes a violation of the Fourth Amendment. *See* Carol M. Bast and Joseph B. Sanborn, Jr., *Not Just Any Sightseeing Tour: Surreptitious Taping in a Patrol Car,* 32 Crim. L. Bull. 123 (1996).

We note, however, that virtually all appellate courts that have considered the issue have rejected the claim that surreptitious taping of a suspect in custody in the rear seat of a patrol car violates the Fourth Amendment. *See United States v. Clark,* 22 F.3d 799 (8th Cir.1994); *United States v. McKinnon,* 985 F.2d 525 (11th Cir.1993); *People v. Newton,* 42 Cal.App.3d 292, 116 Cal.Rptr. 690 (1974); *People v. Palmer,* 888 P.2d 348 (Colo. Ct.App.1994); *State v. Smith,* 641 So.2d 849 (Fla. 1994); *State v. Hussey,* 469 So.2d 346 (La.Ct. App.1985); *People v. Marland,* 135 Mich.App. 297, 355 N.W.2d 378 (1984); *State v. Lucero,* 96 N.M. 126, 628 P.2d 696 (N.M.Ct.App.1981); *K.F. v. State,* 797 P.2d 1006 (Okla.Crim.App.1990); *State v. Wischnofske,* 129 Or.App. 231, 878 P.2d 1130 (1992).

Statements made by a suspect during custodial interrogation are generally inadmissible unless the suspect is first given a Miranda warning. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). The Miranda warnings are required in order to protect a defendant's Fifth Amendment privilege against self-incrimination. *Rhode Island v. Innis,* 446 U.S. 291, 297, 100 S.Ct. 1682, 1688, 64 L.Ed.2d 297 (1980). If the police take a suspect into custody and then ask questions without informing him of the rights enumerated in *Miranda,* his responses generally cannot be introduced into evidence to establish his guilt. *Berkemer v. McCarty,* 468 U.S. 420, 429, 104 S.Ct. 3138, 3144–45, 82 L.Ed.2d 317 (1984). In the present case, it is undisputed that at least a portion of the tape recorded statements were made before the defendant was read his Miranda rights.

The first prong of inquiry in determining whether police conduct constitutes custodial interrogation so as to trigger the Miranda requirements is to determine whether a suspect was in custody. Since the purpose of the Miranda warnings is to safeguard the defendant's Fifth Amendment rights in light of the "inherent pressures of the interrogation atmosphere," *Miranda,* 384 U.S. at 468, 86 S.Ct. at 1624, it is important to consider whether the surroundings are such as to exert coercive pressures on a suspect. The relevant inquiry for Fifth Amendment purposes is "how a reasonable [person] in the suspect's position would have understood his situation." *Berkemer,* 468 U.S. at 442, 104 S.Ct. at 3151.

In the case before us, the defendant had been identified by the alleged victims as the driver who attempted to run them down, had been given a breathalyzer test that indicated illegal alcohol consumption, and had been placed in the rear seat of a patrol car with his friend Easton. The two were later moved from one patrol car to another. The facts and circumstances would indicate to a reasonable person that the defendant was in police custody. The trial court and the court of appeals found that Edrozo was in custody at the time his conversation was recorded in the police car, and we agree.

The second prong of the *Miranda* inquiry is to determine whether the police conduct in question was "interrogation" for purposes of excluding the suspect's statement. In *Innis,* the U.S. Supreme Court concluded that the *Miranda* safeguards apply "whenever a person in custody is subjected to either express questioning or its functional equivalent." 446 U.S. at 300–301, 100 S.Ct. at 1689. The "functional equivalent" of interrogation for purposes of *Miranda* means "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 100 S.Ct. at 1689–90. Such police conduct, to trigger Miranda, "must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id.* at 300, 100 S.Ct. at 1689.

Contained within the Fifth Amendment's protection against compelled self-incrimination is the necessity of some form of compulsion. *Hoffa v. United States,* 385 U.S. 293, 303–04, 87 S.Ct. 408, 414, 17 L.Ed.2d 374 (1966). When the one to whom incriminating statements are made is not known by the suspect to be a police officer, that compulsion is missing. Thus, for instance, statements made in a jail cellblock to an undercover law enforcement officer posing as a fellow inmate are not subject to *Miranda* requirements because the element of coercion is lacking. *Illinois v. Perkins,* 496 U.S. 292, 296, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990). The facts underlying *Perkins* are instructive to understanding the protections of *Miranda.* The speaker was in jail, and so was obviously in custody. *Id.* at 294, 110 S.Ct. at 2396. An undercover law enforcement official, posing as a fellow inmate, entered the jail, engaged Perkins in conversation, and posed questions that resulted in incriminating statements. *Id.* at 294–95, 110 S.Ct. at 2396. The U.S. Supreme Court concluded that *Miranda* did not apply because:

[t]he essential ingredients of a "police-dominated atmosphere" and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate. Coercion is deter-

mined from the perspective of the suspect. When a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking. There is no empirical basis for the assumption that a suspect speaking to those whom he assumes are not officers will feel compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he confess.

*Id.* at 296–97, 110 S.Ct. at 2397 (citations omitted).

For the same reason, *Miranda* is not triggered when a suspect voluntarily speaks to a friend who later reports those conversations to the police. *Hoffa*, 385 U.S. at 304, 87 S.Ct. at 414. In such instances, the necessary connection between the custodial environment and interrogation by one whom the suspect knows to be in control of his fate is lacking. The suspect feels no pressure to curry approval or gain more lenient treatment through cooperation with the police, when the one to whom he is speaking has no apparent control over his future. When, from the perspective of the speaker, statements are freely given to someone other than law enforcement officials, the necessary interplay between police interrogation and custody that creates coercion is not present. *Perkins*, 496 U.S. at 297, 110 S.Ct. at 2397.

■ The court of appeals, nevertheless, concluded that the police conduct in question constituted the "functional equivalent" of interrogation. *Edrozo*, 567 N.W.2d at 61. In doing so, they apparently focused on the officer's subjective motivation for placing the suspects together in the squad car and turning on a tape recorder. *Id.* As stated above, however, proper constitutional analysis of custodial interrogation should focus primarily on the perspective of the suspect, rather than the subjective intent of the police. *Innis*, 446 U.S. at 301, 100 S.Ct. at 1689–90. The U.S. Supreme Court underscored this distinction in *Arizona v. Mauro*, 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987). In *Mauro*, the police allowed a wife to speak with her suspect husband while a police officer was visibly present, tape recording the conversation. *Id.* at 522, 107 S.Ct. at 1933. Although the police knew that the suspect might make incriminating statements, the Supreme Court held that the police conduct in question did not rise to the "functional equivalent" of interrogation, because the suspect "was not subjected to compelling influences, psychological ploys, or direct questioning." *Mauro*, 481 U.S. at 529, 107 S.Ct. at 1936. Instructive to the case before us, the Court also stated that "[o]fficers do not interrogate a suspect simply by hoping that he will incriminate himself." *Id.*

The U.S. Supreme Court, furthermore, has repeatedly stressed the social utility of confessions:

Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. * * * Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

*Miranda*, 384 U.S. at 478, 86 S.Ct. at 1630. Confessions of guilt, or self-incriminating statements, if not compelled by coercive police tactics, are "inherently desirable." *Mauro*, 481 U.S. at 529, 107 S.Ct. at 1936 (quoting *Oregon v. Elstad*, 470 U.S. 298, 305, 105 S.Ct. 1285, 1291, 84 L.Ed.2d 222 (1985)).

The Fifth Circuit addressed a factual setting similar to the present case in a *habeas corpus* proceeding in *Stanley v. Wainwright*, 604 F.2d 379 (5th Cir.1979). In *Stanley*, the court observed that surreptitious taping in a police car did not constitute "interrogation" at all: "the appellants' conversation arose spontaneously while the policemen were physically absent. The policemen's ruse was not the equivalent of inquiry." *Id.* at 382. *Miranda*, the court concluded, is designed to curb unfair police interrogation methods, not to protect spontaneous statements made by suspects simply because they believe they will not be overheard. *Id.*

■ We conclude that the police conduct in this case also did not rise to the level of the "functional equivalent" of interrogation. Edrozo was seated in a police car with Easton, speaking voluntarily about his criminal activity. If Easton, or any other listener,

had reported Edrozo's words to the police, this appeal would be immediately resolved by reference to *Hoffa* and *Perkins*. The only distinguishing feature in this case is that Edrozo was unaware that the police would later have access to his statements by means of the hidden tape recorder. Although it may be true, as asserted by appellant at oral argument, that "human nature" would inevitably encourage an individual in custody in a squad car to relieve his tension by speaking to a companion, that human tendency is not sufficient to transform this set of circumstances into the equivalent of interrogation. No active or coercive police conduct was involved; no subtle psychological ploys were used; no questions were asked at all. At worst, the tension that may have motivated Edrozo to speak was simply a characteristic inherent in the custody itself, and as *Innis* instructs, that is not enough to trigger the *Miranda* requirements. Edrozo chose to speak, and nothing prevents his words from being introduced against him. We therefore conclude that the suppression order was clearly erroneous and reverse the decision of the court of appeals.

### III. The July 29 Statements

■ The state alleges that the trial court erred by suppressing the July 29 statements made by Edrozo to Investigator Miller at the impound lot. The trial court ruled that the statements should be excluded under *Scales*, which requires that "all custodial interrogation including any information about rights, any waiver of those rights, and all questioning shall be electronically recorded where feasible and must be recorded when questioning occurs at a place of detention." *State v. Scales*, 518 N.W.2d 587, 592 (Minn.1994). On its face, *Scales* applies only to custodial interrogation. In this case, the defendant was not in custody. The statements in question were made four days after the defendant had been charged and released. The defendant was not at a detention facility, but at a

police impound lot. He had voluntarily appeared, with his mother, to retrieve personal items from his vehicle, which had been impounded pending investigation. Nor was he being interrogated. The officer testified, and the defendant has not disputed, that he responded to Edrozo's inquiries by reminding him that he had previously invoked his right to be questioned only in the presence of counsel, and that therefore the officer could not talk with him about the case. The trial court found that "Miller refused to talk with him." The statements were made spontaneously, not as a result of custodial interrogation. *Scales* does not apply to Edrozo's voluntary statements made on July 29, 1996 to Investigator Miller at the city impound lot. The statements are admissible, assuming they comply with other rules for admissibility, and we hold that the trial court order suppressing the statements was clearly erroneous. Accordingly, we reverse the decision of the court of appeals affirming the trial court's suppression order.

Reversed and remanded for proceedings consistent with this opinion.

BLATZ, Chief Justice (concurring specially).

While I concur in the judgment of the court, I write separately to emphasize the limits of the holding in this case. The facts of this case presented a very close call on the Fifth Amendment issue. Although the police tactics in this case did not meet the constitutional test for coercion, the police indicated a willingness to use trickery to circumvent the requirements of *Miranda* which is not to be condoned. Additionally, I stress that the court's decision does not determine the legality of the police conduct in this case under the Fourth Amendment of the United States Constitution, article I, section 10 of the Minnesota Constitution, or the related federal and state communications statutes, as these issues were not presented to this court.[1] Police are cautioned that the prac-

---

1. The Fourth Amendment of the United States Constitution and article I, section 10 of the Minnesota Constitution protect "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." These protections are for people, not places. *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576

(1967). To obtain Fourth Amendment protection, an individual must have an actual expectation of privacy and that expectation must be one that society is prepared to recognize as reasonable. *Id.* at 361, 88 S.Ct. at 516 (Harlan, J., concurring). The federal Wire Interception and Interception of Oral Communications Act, 18 U.S.C. § 2510 et. seq. (1997) and the state's

tice of placing suspects together and secretly taping their conversations may violate the suspects' privacy rights under these constitutional and statutory provisions.[2] Without deciding the issue, it would seem disingenuous for the police to develop investigatory practices such as the covert taping in the instant case, the success of which depends upon the privacy expectations of individuals, and then later claim that these expectations are not reasonable.

PAGE, Justice (concurring specially).

I join in the special concurrence by Chief Justice BLATZ.

Privacy of Communications Act, Minn.Stat. ch. 626A (1996) have adopted this standard in defining oral communications which are protected from unauthorized interception or taping. An oral communication is "any oral communications uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." 18 U.S.C. § 2510(2), Minn.Stat. § 626A.01, subd. 4.

2. *See* Carol M. Bast and Joseph B. Sanborn, Jr., *Not Just Any Sightseeing Tour: Surreptitious Taping in a Patrol Car*, 32 Crim. L. Bull. 123 (1996). This article discusses the applicability of *Katz* and the related federal and state communications statutes to conversations held in police cars. It concludes that such conversations are protected because they are communications which an ordinary person would believe are privileged. *Id.* at 132. Significantly, the article points out that this issue affects not only arrestees, but "the unsuspecting private citizen seeking shelter or simply a place of refuge" in the back seat of a closed police car. *Id.* at 133. Indeed, a determination on this issue would even affect whether police officers themselves have a right to privacy in their squad cars to protect them from secret taping by their superiors.