**STATE of Minnesota, Respondent,**

v.

**Todd W. BECKMAN, Appellant.**

**No. C4–82–1463.**

Supreme Court of Minnesota.

Sept. 14, 1984.

C. Paul Jones, Public Defender, Mark F. Anderson, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Julius E. Gernes, Winona County Atty., Winona, for respondent.

WAHL, Justice.

Defendant was charged with aggravated robbery, Minn.Stat. § 609.245 (1982). After the trial court denied his motion to suppress his confession and other evidence on constitutional grounds, defendant waived his right to a trial by jury and agreed to let the trial court determine his guilt on the basis of stipulated facts, thereby preserving his right to raise the suppression issues on appeal without putting the state and himself through the time and expense of a trial. *State v. Lothenbach,* 296 N.W.2d 854 (1980). The trial court found defendant guilty as charged and sentenced him to 54 months in prison, the then-presumptive sentence pursuant to Minn.Stat. § 609.11 (1982) and Minnesota Sentencing Guidelines and Commentary, II.E. (1982). On this appeal, defendant contends that his confession was the fruit of an illegal arrest, was obtained in violation of *Miranda,* and was involuntary. We affirm.

At 5:15 a.m. on March 14, 1982, a man wearing a pillowcase over his head, with holes cut in the pillowcase for his eyes, entered the Hiawathaland Truckstop, which is located in Nodine, Minnesota, in southeastern Winona County on Highway I–90. The man was described by the attendant, Tim Albrecht, as being approximately 5 feet 10 inches tall and of medium build. He was armed with a shotgun, described by Albrecht as a Remington 870 pump action shotgun. He told Albrecht to give him all the money from the cash register and from the cash drawer, an unmarked drawer located beneath the cash register. After ordering Albrecht into a storeroom, he fled.

On March 16 Investigator Becky Schossow of the Winona County Sheriff's Office learned from Investigator Brian Wetterlin that on the evening of March 13, the evening before the robbery, someone had burglarized the residence of Nicholas Baumgartner of Hokah in northeastern Houston County, which is just south of Winona County, taking a Remington 870 pump action shotgun. She learned further that Baumgartner reported that he and two friends had driven by the Baumgartner residence at about 10 p.m. on the 13th and had seen defendant's car parked outside. Baumgartner was a friend of defendant and had assumed that defendant was looking for him. Thinking that defendant would look for him at the bar if he was not home, Baumgartner had continued on to the bar. However, defendant had not come to the bar as Baumgartner expected, and when Baumgartner returned home he discovered the burglary and theft. Investigator Schossow also learned that defendant had worked at the truckstop that was robbed, having been fired by the manager, Darlene Wendt, in January. Schossow learned further that defendant shared a trailer home with another man in a trailer park in Dakota, approximately 5 miles east of Nodine on Highway I–90 and 10 miles north of Hokah.

Schossow and Wetterlin agreed to meet at a service station in Dresbach, which is on Highway I–90 about a mile south of Dakota, and try to find defendant and question him. Wetterlin, driving an unmarked squad car, arrived first and unexpectedly saw defendant's car at the station. He noted the car's license and then drove on and radioed Schossow to meet him at a place near the freeway. After leaving the station, he called in the car's license number and learned that the car was registered to defendant's father; he also checked and found that defendant's license was under revocation. As Schossow and Wetterlin were discussing their options, they saw defendant's car approaching with defendant driving and someone on the passenger side. They noted that the car had no license plate in front. They then followed the car briefly before stopping it on the main street of town.

Both defendant and his companion, Don Henderson, got out and approached the officers. Schossow talked with Henderson, who identified himself, and Wetterlin talked with defendant, who, when asked to produce his license, said that it had been suspended. Asked where they were going, Henderson, who worked at the service station, said they were taking a tire to a truck down the street. The officers told Henderson that he was free to leave and Henderson left. The officers told defendant that they were going to issue citations for driving after revocation and for driving without displaying one of the two license plates, and they asked him if he would be willing to accompany them to the La Crescent Police Station, which is in Houston County about 3 miles south of Dresbach. Defendant agreed and also agreed to let Schossow drive his car to the station for him. On the way, Schossow stopped off at her car and got out her citation book. Defendant rode with Wetterlin.

At the station, Wetterlin told defendant that there were a couple of other things he would like to talk about but he first had to give defendant a *Miranda* warning. He then gave defendant a *Miranda* warning and obtained a waiver. In response to questions, defendant admitted to driving after revocation and said that the front license plate had come off when he ran into a dog. Wetterlin then told defendant what he knew about the burglary on the evening of the 13th and asked defendant some questions relating to it. Defendant first denied going to Baumgartner's house and then admitted it but denied taking anything. Wetterlin then left the room, and Schossow told defendant that she thought he had stolen the gun and that he should come clean. Defendant replied, "Well, I may as well," and proceeded to admit that he took the gun. Schossow then said that she had reason to believe defendant had used the gun in robbing the truckstop on the morning of the 14th. Wetterlin rejoined Schossow at that point, and they both questioned defendant further. During the questioning, defendant signed a consent form permitting the officers to search his car; and the officers also obtained the consent of defendant's father, the car's registered owner, who came to the station. After finding money in the car, the officers questioned defendant further, and defendant admitted that he committed the robbery. He also said that he had hidden the gun at the trailer house of his girlfriend. He consented to a search of his own trailer. The search of his girlfriend's trailer, to which she consented, resulted in the discovery of the gun. Defendant gave a written statement in his own handwriting, acknowledging in the statement that he had been advised of his rights and that his statement was freely and voluntarily given.

Defendant argues on appeal that trial court's refusal to suppress the confession and related evidence was prejudicial error.

(a) First, he argues that the confession was the product of an illegal arrest. Specifically, he argues that this case is similar to *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), in which the Court ruled that the exclusionary rule required the suppression of a confession obtained after police, lacking probable cause to arrest, picked up a suspect for questioning, took him to headquarters, gave him a *Miranda* warning, and questioned him. The Court in *Dunaway* ruled that the application of the fourth amendment's requirement of probable cause does not depend on the nomenclature used to describe the police intrusion on the suspect's freedom of action. Thus, the mere facts that the suspect was not booked or told that he was under arrest and would not have had an arrest record if the questioning had proved fruitless were not alone determinative of the issue of whether in fact the suspect was under arrest at the time he was questioned. Concluding that the defendant was in fact arrested and that the arrest was illegal because of the lack of probable cause, the Court ruled that the trial court prejudicially erred in failing to suppress the confession.

The ultimate test to be used in determining whether a suspect was under arrest is whether a reasonable person would have concluded, under the circumstances, that he was under arrest and not free to go. *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977).

We need not decide whether defendant is correct in arguing that he was under arrest, because it is clear to us that, contrary to defendant's argument, the police had probable cause to arrest him. The fact of whether or not the officers subjectively felt they had probable cause does not foreclose the conclusion that they had objective probable cause. *State v. Speak,* 339 N.W.2d 741, 745 (Minn.1983). The officers knew that the burglary of the Baumgartner residence in Hokah occurred on the evening of March 13 and that the robbery of the truck stop in Nodine occurred several hours later, early on the 14th. They knew that a Remington 870 pump action shotgun and a pillowcase had been taken in the burglary and that a man wearing a pillowcase and armed with a Remington 870 pump action shotgun had committed the robbery. They knew that defendant lived in Dakota, 5 miles from the truck stop and 10 miles from Hokah; that he was a friend of Baumgartner and that he knew about Baumgartner's gun; that his car was seen outside Baumgartner's house late on the 13th, about the time the burglary was committed; that defendant had worked at the truckstop and therefore would have known about the unmarked cash drawer under the cash register; that defendant had been fired from the truckstop in January; and that defendant fit the general description of the robber. Bearing in mind that the standard is probable cause, not proof beyond a reasonable doubt, we conclude that the police had objective probable cause to believe that defendant committed the burglary and robbery.

(b) Defendant's next contention is that, although the police gave him a *Miranda* warning, they did not tell him specifically what they wanted to question him about and therefore his waiver was defective. If a *Miranda* warning is to be anything more than a meaningless ritual, it is of vital importance that a defendant's waiver of his right against compelled self-incrimination and his right to counsel during custodial interrogation be knowing, intelligent and voluntary. *Miranda v. Arizona,* 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966); *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). Whether or not the police have a duty to inform a suspect of the crime about which they intend to question him, and we surmised *in dicta* in *State v. Ponte-Alfonzo,* 348 N.W.2d 734, 735 (Minn. 1984) that they do not,[1] "[i]t is difficult to discern how a waiver of * * * rights could be knowing, intelligent and voluntary where the suspect is totally unaware of the offense upon which the questioning is based." *United States v. McCrary,* 643 F.2d 323, 328 (5th Cir.1981). There is no good reason why investigating officers should not make certain that the person they wish to question understands the nature of the charge or crime about which they wish to question him or her before that person is asked to waive fifth and sixth amendment rights. In the case before us, defendant was asked to accompany police officers in a police car to the LaCrescent Police Department for the purpose of "issuing a ticket for driving after revocation and for no front license plate." Once there, he was asked to waive his *Miranda* rights, whereupon officers questioned him first about the revocation of his license, then about the burglary, and then about the robbery. It is not clear that he was

---

1. There was both omnibus hearing testimony and trial testimony that Ponte-Alfonzo was told and knew why he was being questioned.

free to leave, and we have already determined that the officers had probable cause to arrest him for a felony. There would be grave doubt that the defendant's *Miranda* waiver was valid, except that at the outset of the interrogation officers told defendant that they wanted to question him about other matters as well as about the revocation. Defendant was not "totally unaware" of the offenses upon which the questioning was based. There is nothing in the record, such as defendant's own testimony, indicating that he did not know what those other matters were. In fact, the officers told him that he was suspected of the burglary before they questioned him about it, though not before his waiver of rights, and he must have known that any incriminating statements he made with respect to the burglary would also aid the police in proving that he committed the robbery, about which they questioned him a short time later. We conclude, therefore, that defendant's waiver was valid, but we caution investigating officers to make clear to suspects at the time they are asked to waive their *Miranda* rights the nature of the crimes about which they will be questioned.

■ (c) Defendant's final contention is that his confession was rendered involuntary by the fact that he was told that any cooperation would be brought to the trial court's attention, by the fact that team interrogation techniques were used, and by the fact that defendant was without counsel. In *State v. Anderson*, 298 N.W.2d 63, 65 (Minn.1980), we held that a promise to a defendant that a female friend would be released from jail if he gave a written statement did not render his confession involuntary, stating:

> It is true that a promise to free a relative in exchange for a confession *may* render a confession inadmissible. Police should avoid making promises of this kind in order to encourage a defendant to confess. However, courts do not mechanically hold confessions involuntary just because a promise has been involved. Rather, we must look to the totality of the circumstances, considering all the factors bearing on voluntariness. [Citations omitted.]

More recently, in *State v. Jungbauer*, 348 N.W.2d 344 (Minn.1984), we rejected a contention that the defendant's confession was improperly obtained by a promise to release him pending formal charging and to seek only his summons instead of an arrest warrant. Our opinion quoted the above excerpt from *Anderson*, as above, then added:

> Police should not make promises, implied or expressed, in order to encourage a defendant to confess. However, as we said in *Anderson*, the making of a promise by police does not automatically render any confession obtained thereby involuntary. Rather, we must look to all the circumstances and consider all the factors bearing on voluntariness. Doing that, and bearing in mind that defendant had two prior felony convictions, that he had been advised of his rights and had previously exercised his right to silence, that he was not subjected to any kind of prolonged interrogation or threats; and that the promise was not the sort of promise that might tempt an innocent person to confess, we conclude that defendant's confession was voluntary.

348 N.W.2d at 346–47. *Anderson* and *Jungbauer* control. Defendant's confession in this case was not rendered involuntary by lack of counsel, team interrogation or the fact that he was encouraged to cooperate.

Affirmed.