STATE of Minnesota, Appellant,

v.

Corey Jermaine SCOTT, Respondent.

No. C5–97–682.

Supreme Court of Minnesota.

Aug. 27, 1998.

Hubert H. Humphrey, Esq., Attorney General, St. Paul, Michael O. Freeman, Hennepin County Attorney, by Michael Richardson, Assistant County Attorney, Minneapolis, for Appellant.

Arthur R. Martinez, Esq., Minneapolis, for Respondent.

## OPINION

GILBERT, Justice.

· This pretrial state's appeal involves the suppression of a confession given by Corey Jermaine Scott to police after Scott was arrested as a suspect in several felony drive-by shootings. Scott was not given the *Miranda* warning until 15 minutes into the custodial interrogation. After he was properly given the *Miranda* warning, Scott confessed to committing the drive-by shootings. On appeal, the issues before this court are whether Scott knowingly and voluntarily waived his *Miranda* rights, whether his subsequent confession is admissible, and whether the suppression will have a critical impact on the outcome of the trial. We hold that unless we reverse, the suppression will have a critical impact on the outcome of the trial. We also hold that Scott knowingly and intelligently waived his right to remain silent and that his subsequent confession was voluntarily given and thus is admissible. We reverse the court of appeals and trial court and remand for trial.

During a consecutive 4–day period from May 30, 1996 through June 2, 1996, there were several drive-by shootings in Minneapolis. In each, Scott was alleged to be either a shooter or an intended victim. Scott was shot at on May 30. Robert Williams was shot in the face on May 31 during one of the drive-by shootings. Scott admits to committing drive-by shootings on May 31 and June 1. Scott was the intended victim of a drive-by

shooting on June 2nd that resulted in the death of 11–year–old Byron Phillips. The police were investigating the drive-by shooting which resulted in the murder of Phillips. Several of Scott's acquaintances had given the police Scott's name as being the intended victim of that particular shooting. These acquaintances also identified Scott as being one of the shooters during that 4–day period of drive-by shootings.

Scott was arrested on August 9, 1996. At the time of his arrest, Scott was a juvenile although he was only 10 days from his 18th birthday. The police brought Scott to the police station and began to interrogate him about the multiple drive-by shootings. A videotape and audiotape were made of the entire 3–hour period during which the police questioned Scott. Scott was not given a *Miranda* warning at the time of his arrest, nor during the first 15 minutes of the interrogation. Prior to receiving the *Miranda* warning, Scott did not make any incriminating statements regarding his involvement in the shootings. The officers informed Scott prior to providing the *Miranda* warning that: "Because you're in custody * * * technically before we talk to you and ask you questions, we got to inform you of your rights and stuff." The police then issued the *Miranda* warning in the extensive manner routinely provided to juveniles. Scott stated that he understood his rights after each segment of the *Miranda* warning was read to him. Scott had been arrested a number of times prior to this incident and was familiar with criminal justice procedures.

During the interrogation, the police first informed Scott that they wanted his help in solving the Phillips murder. They asked him to provide any information that he had about who was shooting at him on the day that Phillips was killed. After Scott received the *Miranda* warning, he then set out the course of events that led to the Phillips murder, including identifying whom he believed the shooter to be. Scott also admitted to committing drive-by shootings on two separate

occasions during the interrogation. Scott's first confession was as follows:

> Officer: You were shooting back at the car, right?
>
> Scott: When it was coming head on?
>
> Officer: Yeah.
>
> Scott: Yeah.
>
> * * * *
>
> Officer: You were shooting that little 380 thing that you got?
>
> Scott: Yeah.
>
> Officer: How many rounds did you shoot?
>
> Scott: I don't know, four or five.

Scott confessed to a second drive-by shooting while discussing the course of events leading up to the Phillips shooting. Scott casually stated that he "didn't start shooting till [he saw] the window start coming down" on a vehicle driven by Bogus Boy gang members who had shot at him a couple of days earlier.

During the interrogation, the police used routine interrogation tactics to persuade Scott to tell the truth. The police accused Scott of lying and told Scott that his acquaintances had already been "giving it up." (sic) But the questioning was very low key. The police also made very ambiguous statements about what Scott would or would not be charged with as a result of the interrogation. The interrogation lasted a little more than 3 hours at which time the police informed Scott that he would be charged for the drive-by shootings that he admitted during the interrogation. .

Scott was certified as an adult and charged with the June 1 felony drive-by shooting pursuant to Minn.Stat. § 609.66, subd. 1e (1996).[1] At a subsequent probable cause hearing, the police testified that Robert Williams and Lashawn Slayden, two victims of the drive-by shootings, both identified Scott as the person who committed the first drive-by shooting on May 31, in which they were the intended targets. The police further testified that James Blanche, the father of two other victims of the drive-by shootings, had informed the police that one of his sons identified Scott as the person who com-

---

1. Originally, Scott was also charged with second-degree assault pursuant to Minn.Stat. § 609.222, subd. 1 (1996) for the May 31 shooting. However, the state amended its complaint and dismissed the assault charge.

mitted a second shooting on May 31. This testimony and the confessions were the only evidence linking Scott to the drive-by shootings.

The trial court denied Scott's motion to dismiss but granted Scott's motion to suppress his confession, finding that the *Miranda* warning was inadequate and severely delinquent, rendering the confession involuntary. The state appealed the suppression order in a pretrial appeal, pursuant to Minn. R.Crim. P. 28.04, to the court of appeals, which, in a 2–1 unpublished opinion, affirmed the trial court's decision to suppress. *See State v. Scott*, No. C5–97–682, 1997 WL 698474 (Minn.App., Nov. 10, 1997). The state then appealed to this court. We reverse and remand for trial.

I.

The state may appeal pretrial orders in felony cases pursuant to Minn. R.Crim. P. 28.04, subd. 1(1) provided that in suppression of evidence cases, "the state must 'clearly and unequivocally' show both that the trial court's order will have a 'critical impact' on the state's ability to prosecute the defendant successfully and that the order constituted error." *See State v. Zanter*, 535 N.W.2d 624, 630 (Minn.1995). The court of appeals did not reach the critical impact issue and only decided the suppression issue. Scott argued that the critical impact issue was not ripe, and that the court of appeals need not address the issue because the trial court did not err in suppressing the confession. Scott cited an unpublished court of appeals decision for his authority on the order of addressing these issues. *State v. Williams*, No. C1–96–2242, 1997 WL 193808 (Minn.App., April 22, 1997). The state did not address critical impact in its appeal.

■ However, the critical impact of the suppression must be first determined before deciding whether the suppression order was made in error. *See Zanter*, 535 N.W.2d at 631. In *Zanter*, we changed the sequence that we had used to address these issues from that used in *State v. Webber*, 262

N.W.2d 157, 159 (Minn.1977) and *State v. Kim*, 398 N.W.2d 544, 550 (Minn.1987). In *State v. Edrozo*, 578 N.W.2d 719, 722–23 (Minn.1998), we further emphasized this procedural change as a threshold issue, but *Edrozo* was published after this case had been briefed.[2]

■ Neither party addressed the critical impact issue for us, but the significance of Scott's confession is apparent from the record. In his court of appeals' brief, Scott candidly conceded that generally the suppression of a confession will have a critical impact on the prosecution, citing *Zanter*, 535 N.W.2d at 630. But Scott argues that since the state claims that it has eyewitnesses, the impact of the suppression is reduced. However, since we adopted this standard, we have relaxed the critical impact standard somewhat to include "not only * * * those cases where the lack of the suppressed evidence completely destroys the state's case, but also * * * those cases where the lack of the suppressed evidence significantly reduces the likelihood of a successful prosecution." *Kim*, 398 N.W.2d at 551. When making this determination, we decide what impact suppression of this evidence will have on the state's case; to fully appreciate this impact we must consider the state's evidence as a whole. *See Zanter*, 535 N.W.2d at 630–631. Scott is correct that the only evidence in the record for this drive-by shooting charge is his confession and evidence set forth by the police at the probable cause hearing that they had two potential witnesses who identified Scott as the shooter and one hearsay witness. The suppression of Scott's confession under these facts clearly and unequivocally, at a minimum, "reduces the likelihood of a successful prosecution" and, as such, has critical impact. *See Kim*, 398 N.W.2d at 551.

II.

· ■ We must next determine if the trial court erred in deciding whether Scott voluntarily waived his *Miranda* rights and whether his confession was voluntarily given.

**2.** The proposed Rules of Criminal Procedure require the state's notice of appeal to include a statement "as to how the trial court's alleged error, unless reversed, will have a critical impact on the outcome of the trial." See proposed Minn. R.Crim. P. 28.04, subd. 2(1) and (2).

These issues implicate both the Fifth Amendment and the Fourteenth Amendment to the United States Constitution. The Fifth Amendment prohibits the federal government from compelling a person to testify against him or herself. U.S. Const. amend. V. Similarly, the Due Process Clause of the Fourteenth Amendment prohibits state governments from compelling a person to testify against him or herself. U.S. Const. amend. XIV. These protections may be waived and a person may choose to incriminate him or herself but this waiver must be knowingly, intelligently and voluntarily given. *State v. Jones,* 566 N.W.2d 317, 322 (Minn.1997) (citing *Colorado v. Connelly,* 479 U.S. 157, 163–67, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *Miranda v. Arizona,* 384 U.S. 436, 475, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *State v. Merrill,* 274 N.W.2d 99, 106 (Minn.1978)).

■ However, "[w]hether an accused has knowingly, intelligently, and voluntarily *waived* his right to remain silent and whether he has voluntarily *confessed* are two separate issues. But the relevant factors to be considered are the same." *State v. Williams,* 535 N.W.2d 277, 287 (Minn.1995) (citations omitted). Therefore, the analysis of the two issues significantly overlap although "a suspect can knowingly, intelligently and voluntarily waive his or her right to remain silent, but still can be coerced into making an inculpatory statement." *Jones,* 566 N.W.2d at 323.

■ When a person is in the custody of the police, waiver of these rights cannot be deemed knowing, intelligent and voluntary unless the police inform the person of his or her rights to remain silent and to consult an attorney. *Miranda,* 384 U.S. at 479, 86 S.Ct. 1602. Generally,

> [i]f police fully advise an accused of his or her *Miranda* rights and the accused indicates that he or she understands the rights but nevertheless gives an incriminating statement, the state is deemed to have met its burden of proving that the accused *knowingly* and *intelligently* waived his or her rights.

*Jones,* 566 N.W.2d at 322. However, when "determining whether a juvenile has *voluntarily* waived his or her right to remain silent, * * * a court must further evaluate the totality of the circumstances." *Id.*

> Factors to be considered under the totality-of-the-circumstances test include the juvenile's age, maturity, intelligence, education and prior criminal experience, as well as any physical deprivations during the interrogation, the presence or absence of parents, the length and legality of the detention, the lack of or adequacy of warnings, and the nature of the interrogation.

*Id.* at 322–23. When applying this totality of the circumstances test, "we will not reverse the trial court's specific findings unless they are clearly erroneous, but we will make an independent determination, on the basis of the facts as found, of whether the state has shown by a fair preponderance of the evidence that the waiver was knowing, intelligent and voluntary." *Id.* at 324.

■ The state argues that *Miranda* warnings were not necessary when the police questioned Scott on the Phillips shooting. The state argues that the nature of the police questioning was not designed to elicit an incriminating response from Scott and, therefore, there was no "interrogation" of Scott prior to the issuance of the *Miranda* warning.[3] The state cites *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) for the proposition that an "interrogation" only occurs when the police ask questions which are likely to elicit an incriminating response.

The state is incorrect in its assertions that *Miranda* warnings were not required as well as its claim that Scott was not being "interrogated" as defined by *Miranda* and *Innis.* The police are required to provide *Miranda* warnings to any person who is the subject of a custodial interrogation. *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602. The state acknowledges that Scott was the subject of a custodial detention because he was arrested at gunpoint and transported to the police station in

---

**3.** The state does not address whether Scott voluntarily waived his *Miranda* rights *after* receiving the *Miranda* warning. The state only addresses the voluntariness of the confession post-*Miranda,* which is a separate inquiry as set forth above.

handcuffs. Therefore, *Miranda* warnings should have been given to Scott before commencement of the police interrogation.

The United States Supreme Court held in its *Miranda* opinion that the state "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602.

While it is true that Scott was an alleged intended victim and a witness to the Phillips drive-by shooting, he was also a suspect in other related drive-by shootings. He was in custody as a suspect and the alleged retaliatory nature of the related shootings is apparent from the record. The Supreme Court has concluded that,

> the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. The focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.

*Innis,* 446 U.S. at 300–01, 100 S.Ct. 1682.

▮▮ The first 15 minutes of Scott's interrogation were unwarned and without the required procedural safeguards. Accordingly, we hold that any statements made by Scott during the unwarned interrogation are inadmissible. But that delay does not automatically taint the rest of the interrogation. We must now address the remainder of the answers given during the interrogation after Scott did receive the *Miranda* warning. Scott argues that when applying the totality of the circumstances test, his waiver of *Miranda* rights was involuntary because: (1) the *Miranda* warnings were inadequate and delinquently given; and (2) prior to discussing the Phillips shooting (and pre-*Miranda* ), the police mentioned in detail the three shootings to Scott in which Scott was a suspect, knowing that any information that Scott provided on those shootings could incriminate him.

The trial court held that Scott did not voluntarily waive his *Miranda* rights under the totality of the circumstances test, focusing upon the fact that the police only referred to *Miranda* rights as a "technicality" and the fact that the entire purpose for Scott's interrogation was misleading. The trial court also found that the police gave Scott the impression that he would not be charged based on the information that he was providing. The court of appeals affirmed the trial court's holding.

We disagree.

On numerous occasions we have rejected a person's claim that waiver of his or her *Miranda* rights after receiving the warning was involuntary. *See, e.g., State v. Ouk,* 516 N.W.2d 180, 185 (Minn.1994) (holding that a 15–year–old was of suitable intelligence and maturity to validly waive *Miranda* rights, specifically focusing on the fact that the juvenile had been advised of his rights on three prior occasions and had once asked for an attorney); *State v. Beckman,* 354 N.W.2d 432, 436–37 (Minn.1984) (adult defendant held to have validly waived *Miranda* rights even though the police originally told him that they wanted to question him about a driving revocation charge and later questioned him about a burglary charge).

In one instance, we held that a juvenile's waiver was involuntary. *See In re S.W.T.,* 277 N.W.2d 507, 513 (Minn.1979). In *S.W.T.,* the defendant, a 12–year–old who was emotionally disturbed and functioning on the level of an 8–year–old, simply nodded his head when asked if he understood each statement

in the warning. *Id.* This court held that his waiver was involuntarily given because the juvenile was incapable of understanding or intelligently waiving his rights. *Id.*

*S.W.T.* is distinguishable from this case. Scott was ten days from his 18th birthday, had been previously arrested and detained, and had been given *Miranda* warnings during those arrests. The record does not reflect exactly how many times Scott had been previously arrested, but it does indicate that he was familiar with the criminal justice system. He was mature, articulate and appeared on the videotape to comprehend the questioning and the context of what was occurring. The length of the detention was reasonable and the legality of the arrest was not challenged. Further, the nature of the interrogation was on an overall low-key basis and Scott suffered no physical deprivations during the interrogation. While the police did not clearly inform Scott of the potential charges against him, Scott should have been aware of potential criminal responsibility since he was arrested at gunpoint and handcuffed before being brought to the police station. *See Ouk,* 516 N.W.2d at 185 (juvenile imputed to know of potential criminal responsibility because of the method of arrest and interrogation). Under the facts presented here, we hold that the state has shown by a fair preponderance of the evidence that Scott validly waived his *Miranda* rights.

### III.

We next consider whether the delay in giving the *Miranda* warning taints the remainder of the interrogation. The trial court and the court of appeals held it did. We disagree. In suppressing the confessions Scott made after receiving the *Miranda* warning, the lower courts ignored decisions of both the Supreme Court and of this court that generally hold a failure to give a required *Miranda* warning does not render involuntary any subsequent statement made after the giving of a *Miranda* warning. *Oregon v. Elstad,* 470 U.S. 298, 309, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) and *State v. Champion* 533 N.W.2d 40, 44 (Minn.1995).

The Supreme Court has held that "[t]hough *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Elstad,* 470 U.S. at 309, 105 S.Ct. 1285. The police did mention three possible drive-by shootings wherein Scott might be a suspect before giving him the *Miranda* warning and engaging him in conversation. In view of our holding that the *Miranda* warning that was eventually given was sufficient, the subsequent confession is admissible under *Elstad.* The legality of the arrest in this case has not been challenged. Therefore, the traditional Fourth Amendment analysis which brought forth the application of the "fruit of the poisonous tree" doctrine, *see Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), would not be applicable to this alleged procedural *Miranda* violation. The Supreme Court has held in an illegal arrest situation that "[w]here a Fourth Amendment violation 'taints' the confession, a finding of voluntariness for the purposes of the Fifth Amendment is merely a threshold requirement in determining whether the confession may be admitted into evidence." *Elstad,* 470 U.S. at 306, 105 S.Ct. 1285.

The court further stated that:

We must conclude that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarranted statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.

*Id.* at 314, 105 S.Ct. 1285. As in *Elstad,* the reading of Scott's rights was undeniably complete, though belated.

The relevant inquiry is whether, in fact, the second statement was also voluntarily

made. * * * The fact that a suspect chose to speak after being informed of his rights is, of course, highly probative. * * * No further purpose is served by imputing "taint" to subsequent statements obtained pursuant to a voluntary and knowing waiver. We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings.

*Id.* at 318, 105 S.Ct. 1285.

We conclude that Scott knowingly and voluntarily waived his right to remain silent before he described his participation in a drive-by shooting for which he was subsequently charged. It is highly probative that Scott chose to speak after being informed of his rights. We also conclude that the dictates of *Miranda* and the goals of the Fifth Amendment proscription against the use of compelled testimony are fully satisfied by suppressing all statements made prior to his receiving the *Miranda* warning. Scott, having once responded to unwarned yet uncoerced questioning was not disabled from waiving his rights and confessing after he was given the requisite *Miranda* warning. By barring use of the unwarned statements, we also have removed any possible adverse inference from further consideration by the fact finder in the case in chief.

## IV.

Next, we must address whether Scott voluntarily confessed to committing the two drive-by shootings. We have stated:

> Even when a defendant has knowingly, intelligently and voluntarily waived his or her right to remain silent, the state still must show the voluntariness of a confession by a preponderance of the evidence. The test of voluntariness is whether the actions of the police, together with other circumstances surrounding the interrogation were so coercive, so manipulative, so overpowering that the defendant was deprived of his ability to make an unconstrained and wholly autonomous decision to speak as he did.

*Jones,* 566 N.W.2d at 326 (citations and internal quotes omitted). We have also held that when the police extract a confession through the use of deceit and/or stress inducing interrogation techniques, the resulting confession will be inadmissible. *Id.* In making this determination, "this court will ask whether the deceit is the kind that would make an innocent person confess. Only when the answer to this question is yes will we conclude that the statement was given involuntarily." *Id.*

▪ .Here we hold that the state established by a preponderance of the evidence that Scott's confession was voluntarily given. The interrogation was not so coercive, manipulative or over-powering that he was deprived of his ability to make an unconstrained and wholly autonomous decision to speak as he did. The questioning was neither threatening, deceitful, nor stress inducing and was consistent with routine police practices. Scott was well aware of his rights at the time he confessed. He repeatedly admitted to committing the shootings in question. Scott was also familiar enough with the criminal justice system to have a reasonable expectation that he would not be set free after his admissions. Toward the end of the interrogation a third officer began questioning Scott in an overly aggressive and confrontational manner, which we do not condone. However, Scott confessed to committing the drive-by shootings prior to this officer's participation in the interrogation and, therefore, that officer's influence did not impact the voluntary nature of Scott's confession. Under the totality of the surrounding circumstances, we cannot say that Scott's confession was involuntarily given. Scott, who earlier responded to unwarned but uncoercive questioning, was not thereby disabled from waiving his rights and confessing after he was given the requisite *Miranda* warning.

In sum, we hold that the suppression of the confession would significantly reduce the likelihood of a successful prosecution and, therefore, critical impact has been established. We further hold that Scott voluntarily waived his *Miranda* right to remain silent,

and that he voluntarily confessed to the drive-by shooting.

Reversed and remanded for trial.

PAGE, Justice (concurring specially).

As the court notes, critical impact is a threshold issue. Thus, while I agree with the court's analysis of the *Miranda* issues, I would not reach those issues at this time because the state has not presented any evidence on whether suppression of Scott's confession would have a critical impact on the outcome of the trial. Unlike Justice Tomljanovich, however, who would dismiss the appeal and remand for trial, I would have the parties brief the issue of whether suppression of the confession would have a critical impact on the outcome of the trial.

TOMLJANOVICH, Justice (dissenting).

I respectfully dissent. While I do not disagree with the majority's analysis of the *Miranda* issue, we should not even reach this issue because the state has not sustained its burden of showing how the trial court's suppression of Scott's confession will critically impact the outcome of trial.

I do not agree that *State v. Zanter* changed the sequence in which we would address pretrial suppression issues. *State v. Zanter*, 535 N.W.2d 624 (Minn.1995), and *State v. Edrozo*, 578 N.W.2d 719 (Minn.1998), simply restated what has always been the law, and the law we should follow today.

The majority has found facts as to the impact of the suppressive confession and then has done what should be the job of the state: argued the critical impact of t hose facts.

I would dismiss the appeal and remand for trial.

GARDEBRING, Justice (dissenting).

I join in the dissent of Justice TOMLJANOVICH.