**STATE of Minnesota, Appellant,**

v.

**Janet Sue SHRINER, Respondent.**

**No. A07–181.**

Court of Appeals of Minnesota.

Oct. 2, 2007.

Lori Swanson, Attorney General, St. Paul, MN; and James C. Backstrom, Dakota County Attorney, Debra E. Schmidt, Assistant County Attorney, Hastings, MN, for appellant.

Jeffrey B. Ring, Jeffrey B. Ring and Associates, Minneapolis, MN, for respondent.

Considered and decided by WILLIS, Presiding Judge; MINGE, Judge; and HUDSON, Judge.

## OPINION

MINGE, Judge.

The state challenges the pretrial suppression of the results of a warrantless, nonconsensual blood draw, arguing that the presence of alcohol constitutes sufficient exigent circumstances to justify a blood draw. Because we conclude that under the facts present, there was insufficient evidence of exigent circumstances, we affirm.

## FACTS

Respondent Janet Shriner was involved in a two-car motor-vehicle accident on May 8, 2006, at approximately 9:26 p.m. in Burnsville. Shriner drove her vehicle in the wrong lane of traffic and struck another vehicle head-on, injuring the driver of the other vehicle. Shriner fled the scene of the accident in her vehicle. Burnsville Police Officer Maksim Yakovlev was dispatched to find Shriner. Officer Yakovlev located and, with the assistance of another officer, forcibly stopped Shriner's vehicle. Because Shriner did not comply with the officers' requests to step out of her vehicle and its doors were locked, the officer broke a window, opened a door, and removed Shriner. Officer Yakovlev observed that Shriner's eyes were bloodshot and glazed-over, that she smelled of alcohol, and that she could not stand on her own. He also observed that she was not injured.

Officer Yakovlev arrested Shriner and transported her to nearby Fairview Ridges Hospital. Once there, he directed hospital staff to make a blood draw. The draw was completed less than 45 minutes after the time of the arrest. Shriner's consent was not sought or obtained and no implied-consent advisory was given to her. Officer Yakovlev testified that he was not "worried [that Shriner] was about to slip under the legal limit at any given moment," and he did not attempt to obtain a search warrant.

Shriner was subsequently charged with seven criminal counts including first-degree driving while impaired, in violation of Minn.Stat. § 169A.20, subd. 1(5) (2004), and criminal vehicular operation resulting in bodily harm, in violation of Minn.Stat. § 609.21, subd. 2b(4) (2004).

The district court held an omnibus hearing at which Shriner moved to suppress the blood-test results. Shriner conceded the existence of probable cause to seek the blood test, but asserted that without her consent or a warrant, the blood draw was improper. After granting Shriner's motion to suppress the blood-test evidence, the district court dismissed the first-degree driving-while-impaired and criminal-vehicular-operation charges under Minn. Stat. §§ 169A.20, subd. 1(5) and 609.21, subd. 2b(4). This appeal by the state follows.

**ISSUES**

I. Did the suppression of blood-test results have a critical impact on the state's case?

II. Did the district court err in suppressing the blood-test evidence?

**ANALYSIS**

■ The district court's decision to suppress evidence is a question of law, and we "independently review the facts" to determine whether the decision is erroneous. *State v. Harris,* 590 N.W.2d 90, 98 (Minn. 1999). If the state appeals from a pretrial suppression order, it must "clearly and unequivocally show both that the [district] court's order will have a critical impact on [its] ability to prosecute the defendant successfully and that the order constituted error." *State v. Scott,* 584 N.W.2d 412, 416 (Minn.1998) (quotation omitted). "[T]he critical impact of the suppression must be first determined before deciding whether the suppression order was made in error." *Id.*

**I.**

■ The first issue is whether the suppression of the result of the blood test will have a critical impact on the state's case. In a critical-impact inquiry, we consider whether "the lack of the suppressed evidence completely destroys the state's case" or "significantly reduces the likelihood of a successful prosecution." *State v. Kim,* 398 N.W.2d 544, 551 (Minn.1987). Suppression of alcohol-level test results has a critical impact even if there is other evidence of intoxication. *State v. Ault,* 478 N.W.2d 797, 799 (Minn.App.1991).

■ Here, the significance of the district court's order suppressing the blood-test evidence is apparent. The district court determined that the charges of both criminal vehicular operation and first-degree driving while impaired required proof that Shriner's blood-alcohol level was above .08. Because evidence of Shriner's blood-alcohol level was suppressed, both charges were dismissed.[1] Thus, the suppression of this significant evidence has a critical impact on the state's case.

1. We note that five charges remained against Shriner. The parties do not argue and we do

## II.

The next issue is whether the district court erred in suppressing the blood-test evidence. The state contends that exigent circumstances justified a warrantless draw of Shriner's blood.

The United States Constitution's Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. Our state constitution contains a parallel provision. Minn. Const. art. I, § 10. A search and seizure conducted without a warrant is per se unreasonable. *State v. Othoudt*, 482 N.W.2d 218, 221–22 (Minn. 1992). A warrant must be supported by probable cause. Minn. Const. art. I, § 10. "The requirement that a warrant be obtained is a requirement that inferences to support the search be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Schmerber v. California*, 384 U.S. 757, 770, 86 S.Ct. 1826, 1835, 16 L.Ed.2d 908 (1966) (quotation omitted). But the warrant requirement is " 'subject . . . to a few specifically established and well delineated exceptions.' " *State v. Hanley*, 363 N.W.2d 735, 738 (Minn.1985) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)). "The state bears the burden of showing that at least one of the exceptions applies in order to avoid suppression of the evidence acquired from the warrantless search." *State v. Johnson*, 689 N.W.2d 247, 251 (Minn.App.2004), *review denied* (Minn. Jan. 20, 2005). One such exception is the existence of exigent circumstances.

*State v. Paul*, 548 N.W.2d 260, 264 (Minn. 1996).

The administration of a blood test is considered a search that must comply with the Fourth Amendment. *Schmerber*, 384 U.S. at 767, 86 S.Ct. at 1834. In order to meet the requirements of the Fourth Amendment, a warrantless, nonconsensual blood draw must be supported by both probable cause and exigent circumstances. *State v. Aguirre*, 295 N.W.2d 79, 81 (Minn.1980). Probable cause to search exists when, given the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *State v. Zanter*, 535 N.W.2d 624, 633 (Minn.1995). Here, Shriner stipulates that the deputy had probable cause to believe that she was under the influence of alcohol. Therefore, the sole disputed issue in this case is whether exigent circumstances justified the warrantless, nonconsensual blood draw.

When determining whether the situation presented exigent circumstances, we examine the totality of the circumstances. *State v. Lohnes*, 344 N.W.2d 605, 611 (Minn.1984). But "[e]xigent circumstances can [also] be established . . . by a single factor." *Johnson*, 689 N.W.2d at 251. Exigent circumstances exist when there is a danger of the "imminent destruction of evanescent evidence." *Paul*, 548 N.W.2d at 264. Because alcohol in the blood has an evanescent quality, a warrant may not be necessary for a blood draw, depending on the amount of time that has elapsed since the accident and the difficulty in obtaining a warrant. *See Schmerber*, 384 U.S. at 770–71, 86 S.Ct. at 1836. In

---

not consider whether the suppression order has a critical impact on those charges or whether the survival of those charges is relevant to the critical-impact question. We also note that this court has adopted the view that

"even an order dismissing only one count of a multi-count complaint may have critical impact." *State v. Koenig*, 649 N.W.2d 484, 487 (Minn.App.2002).

*Schmerber*, the Supreme Court concluded that exigent circumstances were present because the officer, who authorized a warrantless blood draw within two hours of an accident,

> might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence. We are told that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system. Particularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant.

*Id.* at 770–71, 86 S.Ct. at 1835–36 (quotation and citation omitted). And in conducting an exigent-circumstances analysis, Minnesota cases have emphasized factors such as the evanescent nature of alcohol in the blood, the passage of time, and the potential unavailability of the defendant once he or she is taken to the hospital for treatment. *See, e.g., State v. Oevering,* 268 N.W.2d 68, 74 (Minn.1978).

The state contends that exigent circumstances existed justifying the warrantless draw of Shriner's blood. The state essentially takes the position that due to the evanescent nature of alcohol, the presence of alcohol in an individual reasonably suspected of an alcohol-related crime is an exigent circumstance per se justifying a warrantless blood draw. To support its position, the state cites numerous previous decisions of the supreme court and both published and unpublished opinions of this court, including *Paul,* 548 N.W.2d at 266; *State v. Heaney,* 689 N.W.2d 168, 173 n. 2

(Minn.2004); *Aguirre,* 295 N.W.2d at 79; and our decision in *Johnson,* 689 N.W.2d at 252. In *Paul,* the supreme court recognized the need for officers to "act as quickly as possible" to avoid the dissipation of blood-alcohol evidence. 548 N.W.2d at 267. In *Heaney,* the supreme court again noted the "natural exigency involved in obtaining blood-alcohol evidence." 689 N.W.2d at 173 n. 2. Although the *Aguirre* decision upheld the constitutionality of a nonconsensual, warrantless blood draw, the issues on appeal concerned the lack of an arrest and the interplay between the implied-consent law and the level of charges. 295 N.W.2d at 80–83. The *Aguirre* court did not consider the U.S. Supreme Court's decision in *Schmerber.* And in *Johnson,* we concluded that, *based on the facts of the case,* the possible destruction of blood-alcohol evidence amounted to an exigent circumstance supporting a warrantless search. 689 N.W.2d at 252. Several other cases deal with the intricacies of the implied-consent law. *See* Frederic Bruno, *The Drinking Driver in Minnesota* § 2.10 (3rd ed.2006).[2]

■ A careful review of our caselaw indicates that although there are comments which lend some support to the state's position, none has expressly held that the presence of alcohol is a per se exigent circumstance sufficient to justify a warrantless blood draw. Other jurisdictions take conflicting positions on this issue. *Compare State v. Rodriguez,* 156 P.3d 771, 782 (Utah 2007) (declining to assign "per se exigent circumstance status" to warrantless blood draws, but upholding warrantless blood draw at issue in the case based on the totality of the circumstances), *with State v. Cocio,* 147 Ariz. 277, 709 P.2d 1336, 1344–46 (1985) (allow-

---

**2.** We emphasize that no implied-consent advisory was given to respondent and that we do not consider Minn.Stat. §§ 169A.50–.53 (2006).

ing police to obtain blood without a warrant when blood has already been drawn for medical purposes), *and State v. Bohling,* 173 Wis.2d 529, 494 N.W.2d 399, 400 (1993) ("[T]he dissipation of alcohol from a person's blood stream constitutes a sufficient exigency to justify a warrantless blood draw"). A close reading of *Schmerber* and other United States Supreme Court decisions does not support the state's position. *See, e.g., Skinner v. Ry. Labor Exceecutives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (upholding a warrantless blood draw in civil investigations of railroad accidents); *South Dakota v. Neville,* 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983) (rejecting a claim that admission of evidence of refusal to submit to blood-alcohol test violates the privilege against self-incrimination).

In *Rodriguez,* the Utah Supreme Court reviewed the legal landscape on this issue, determined that *Schmerber* is still good law, and concluded:

> In light of the foregoing, it is difficult for us to imagine that the United States Supreme Court could muster the assurance that the consequences of alcohol dissipation are so great and the prospects for prompt warrant acquisition so remote that per se exigent circumstance status be awarded to seizures of blood for the purpose of gathering blood-alcohol evidence. Accordingly, we decline to grant per se exigent circumstance status to warrantless seizures of blood evidence.

156 P.3d at 782. The Fourth Amendment represents a fundamental public policy of protecting personal privacy and dignity against unwarranted intrusion by the state. We decline the opportunity to reject the United States Supreme Court's

decision in *Schmerber* and to adopt a per se rule.

■ The question then becomes whether in this proceeding there are factors, together with the suspected presence of alcohol, that constitute exigent circumstances sufficient to justify the warrantless blood draw. We employ a totality-of-the-circumstances approach. Here, Shriner was arrested at her vehicle one-half mile from Fairview Ridges Hospital. Officer Yakovlev quickly transported Shriner to that hospital and a blood draw was made less than 45 minutes after she was last in the driver's seat of her vehicle. He did not give her the implied-consent advisory or seek her consent to the draw. Officer Yakovlev did not believe that Shriner was injured, did not have responsibility for any other person injured as a result of the accident, and did not have a crime scene that required his attention. He was able to focus on acquiring evidence of Shriner's intoxication. Based on a two-hour rule to establish guilt under Minn.Stat. §§ 169A.20, subd. 1(5) (2004), and 609.21, subd. 2b(4) (2004), the question becomes whether a warrant could reasonably have been obtained within a timeframe that would not have compromised the test results.[3]

■ The process for obtaining a search warrant is set out in the statutes and court rules. *See* Minn.Stat. §§ 626.04 to 626.18 (2006); Minn. R.Crim. P. 36. Although the prosecuting attorney often handles the application for a search warrant, law enforcement may apply directly to the judge. *See, e.g., State, City of Minneapolis v. Cook,* 498 N.W.2d 17, 18–19 (Minn.1993); *State v. McGrath,* 706 N.W.2d 532, 537 (Minn.App.2005). In this case, it was eve-

---

**3.** "Generally, the rate by which an individual eliminates alcohol from his [or her] body is 0.015% per hour." Kimberly S. Keller, *So-* *bering up* Daubert: *Recent Issues Arising in Alcohol–Related Expert Testimony,* 46 S. Tex. L.Rev. 111, 125 (2004).

ning. The Burnsville police officers may have had to contact a prosecuting attorney at home to prepare a warrant request. Next, law enforcement would have had to locate a judge, request a warrant, obtain the warrant, and then provide evidence of the warrant to the staff at the Fairview Ridges Hospital to authorize the nonconsensual blood draw. This takes expeditious action.

■ Minnesota law authorizes the use of telephonic warrants. *See* Minn. R.Crim. P. 36.01. Caselaw has recognized the availability and validity of telephonic search warrants. *See, e.g., State v. Lindsey,* 473 N.W.2d 857 (Minn.1991). In *State v. Raines,* 709 N.W.2d 273, 275 (Minn.App. 2006), *review denied* (Minn. Apr. 18, 2006), police officers requested a telephonic warrant at 3:10 a.m. in Pine County. The warrant was executed within one hour and fifty minutes. *Id.* And in *State v. Cook,* 498 N.W.2d 17, 18–19 (Minn.1993), a judge issued a telephonic search warrant less than one hour after the request for the warrant was made. Here, the state has made no showing that it would have been unable to obtain a timely telephonic search warrant.

■ The state argues that the existence of probable cause to believe that Shriner had violated the criminal-vehicular-operation statute justifies the warrantless blood draw. The state cites Minn. Stat. § 169A.52, subd. 1 (2004), which provides that "if a peace officer has probable cause to believe that the person has violated section 609.21 (criminal vehicular homicide and injury), a test may be required and obtained despite the person's refusal." "When an officer has probable cause to believe [that] a driver is intoxicated and has committed criminal vehicular operation, the officer may order the taking of a blood sample without obtaining the driver's consent." *State v. Condon,* 497

N.W.2d 272, 275 (Minn.App.1993). But as we have already determined, the constitutional requirements for a nonconsensual search include both probable cause *and* either a search warrant or the existence of one of the warrant exceptions. Neither the statute nor the *Condon* case mentions the constitutional limits on searches and the necessity of exigent circumstances to dispense with search warrants.

We note that although the constitutional limits on searches was argued to and addressed by the district court, and is argued by the parties on appeal, the district court did not consider, and on appeal the parties do not address, the constitutionality of Minn.Stat. § 169A.52, subd. 1. We do not usually consider legal issues not properly raised. *Roby v. State,* 547 N.W.2d 354, 357 (Minn.1996). But we assume that the legislature does not intend to violate the constitution. Minn.Stat. § 645.17(3) (2006). We therefore note that Minn.Stat. § 169A.52, subd. 1, does not refer to search warrants. We construe the subsection as not dispensing with the warrant requirement when a warrant can be obtained and is otherwise required by the constitution. Likewise, we consider the exigent-circumstances requirement as a part of the statute. In reaching this conclusion, we emphasize that the exigent-circumstances requirement is not a high threshold. The physical condition of the suspect and other persons, the evanescent nature of alcohol in the blood, and the time requirements needed to obtain a warrant and a blood test no doubt will combine to constitute exigent circumstances in most cases.

Here, the district court did not find that exigent circumstances existed to dispense with the warrant requirements. As already noted, the totality of the circumstances do not support an exigency determination. Officer Yakovlev testified that

he was not concerned about the dissipation of alcohol from Shriner's blood. The scene of the arrest was near the hospital; the time needed to make a blood draw was minimal. The officer was not faced with competing responsibilities. Equally significant, the district court did not find that obtaining a nighttime search warrant was time consuming or created exigent circumstances. The record is silent on the local warrant process and the state does not claim that there is any difficulty in obtaining nighttime or telephonic warrants. On this record, when neither the prosecution nor the district court judge was concerned with the officer's ability to promptly obtain a warrant, and the district court held a warrant should have been obtained, we are unwilling to reverse the district court and assume that the time needed to obtain a warrant created an exigent circumstance.

■ The state argues that given the inherent stress that accompanies an accident and arrest situation, the officer should not have to make a judgment call on whether a warrant can be obtained. We do not suggest that the officer's decision is easy. In determining whether a situation presented exigent circumstances, district courts give due consideration to the wide range of circumstances facing law enforcement. *See, e.g., Rodriguez,* 156 P.3d at 781 (emphasizing that serious nature of accident and injuries, together with significant evidence of driver's impairment were "sufficient to establish that the interests of law enforcement outweighed ... [the driver's] privacy interests"). On this record where no extenuating circumstance other than the evanescent quality of alcohol is present, we conclude the district court did not err in holding that the police officer must obtain the driver's consent or obtain a warrant.

## DECISION

The Fourth Amendment of the United States Constitution precludes using the results of a warrantless, nonconsensual blood draw in a criminal prosecution unless law enforcement has probable cause to believe criminal conduct has occurred and there are exigent circumstances in addition to evidence of alcohol consumption. Because the record in this proceeding does not show the presence of necessary exigent circumstances, we affirm.

**Affirmed.**

WILLIS, Judge (dissenting).

I respectfully dissent from the majority's holding, which would require an on-the-scene assessment of the degree of exigency of the need for alcohol-concentration testing even when police believe a serious criminal offense has occurred.

As the majority points out, both probable cause and exigent circumstances are needed to justify the warrantless removal of blood. *State v. Aguirre,* 295 N.W.2d 79, 81 (Minn.1980). The majority asserts that there is no authority holding that the presence of alcohol, and the need, therefore, to test for it, is by itself an exigent circumstance. But our supreme court has unmistakably implied that it is, even when the less-serious offense of DWI is the only crime suspected. *See Tyler v. Comm'r of Pub. Safety,* 368 N.W.2d 275, 278 (Minn. 1985) (stating that warrantless removal of blood is constitutional if there is probable cause to believe that the offense of DWI has been committed "and that the removal of the blood is necessary to preserve evidence of guilt"). The majority cites no Minnesota decision requiring a case-by-case assessment of the exigency of the need for alcohol testing that its decision imposes, even in DWI cases, which are less serious than the crime suspected in this case.

The majority's holding rests on a highly selective reading of the caselaw in Minnesota. The majority notes that *Aguirre* fails to consider *Schmerber*. But that is because in *Aguirre* the supreme court treats as settled law its decision in *State v. Oevering*, 268 N.W.2d 68, 72 (Minn.1978), in which it broadly construed *Schmerber* as recognizing exigent circumstances when "destruction of the evidence (i.e., the blood-alcohol content) is threatened." This broad reading of *Schmerber* is essential to the development of implied-consent law in Minnesota. Without it, the supreme court could not have stated, as it did in *Nyflot v. Comm'r of Pub. Safety*, after citing *Schmerber*, that the legislature "could repeal the implied consent law and direct police officers to administer chemical tests against the suspect's will." 369 N.W.2d 512, 517 (Minn.1985). That view of *Schmerber* leaves no room for the majority's reading of the case as limited to its facts, a reading that the majority treats not just as an arguable interpretation of *Schmerber* but as its unchallenged holding.

In cases involving the more serious offense of criminal vehicular operation (or homicide), our supreme court has long held that police need not resort to the implied-consent statute, or otherwise obtain the driver's consent, in order to constitutionally obtain a blood sample without a warrant. *See State v. Speak*, 339 N.W.2d 741, 744–45 (Minn.1983); *Aguirre*, 295 N.W.2d at 82. In none of these cases has the supreme court held that the exigency of obtaining a blood sample depends on the degree of the driver's apparent intoxication, the distance from a hospital, or the logistics of obtaining a telephonic search warrant, some of the factors cited by the majority. Requiring police officers to balance such factors on the scene poses an impossible burden.

Assessing the relevant "exigency" factors is not an easy task even for a court. For example, the driver's apparent degree of intoxication is not as relevant as the majority suggests. The supreme court has emphasized that an officer need not have probable cause to believe that a driver is intoxicated in order to have blood drawn, only "probable cause to believe that administration of a blood alcohol test will result in the discovery of evidence relevant in the prosecution of a crime." *State v. Lee*, 585 N.W.2d 378, 382 (Minn.1998). And a driver cannot be too drunk for her alcohol concentration to be relevant evidence. The officer at the scene cannot gauge a driver's alcohol concentration or know whether a prosecutor would prefer to charge her with negligent driving while impaired or negligent driving with an alcohol concentration over .08. The exigency exists because "the removal of the blood is necessary to preserve evidence," *Tyler*, 368 N.W.2d at 278, not because the driver's intoxication is a close question.

In summary, there is a bright-line rule that the majority opinion obscures. The obscuring of that line will cause confusion for the police. *See State v. Schinzing*, 342 N.W.2d 105, 109 (Minn.1983) (noting that requiring case-by-case assessment of whether police can ask for a driver's license "would create unnecessary confusion among the police"). Police officers should not have to balance likely intoxication levels against the logistics of telephonic warrants at the scene of a serious accident.